FILED

2009 MAY 28  PM 2: 42

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2007 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>            v.<br><br>SERGIO PANTOJA,<br>  aka "Tricky,"<br>ISAAC GUILLEN,<br>  aka "Coach,"<br>INGRID VERONICA TERCERO,<br>  aka "Morena,"<br>  aka "More,"<br>JOSE GUADALUPE DELAGUILA,<br>  aka "Skipper,"<br>SALVADOR RUIZ,<br>  aka "Shaggie,"<br>EDUARDO HERNANDEZ,<br>  aka "Oso,"<br>  aka "Terco,"<br>JOSE CRUZ SALDANA,<br>  aka "Tiger,"<br>JUAN PABLO MURILLO,<br>  aka "Face,"<br>VLADIMIR IRAHETA,<br>  aka "Jokes,"<br>  aka "Slick,"<br>  aka "the Twin,"<br>LEONIDAS IRAHETA,<br>  aka "Druggy,"<br>  aka "Drugs,"<br>  aka "the Twin,"<br>  aka "Shysty,"<br>DAVID RODRIGUEZ,<br>  aka "Player," | No. CR 07-1172(B)-DDP<br><br>S E C O N D<br>S U P E R S E D I N G<br>I N D I C T M E N T<br><br>[18 U.S.C. § 1962(d):<br>Racketeer Influenced and<br>Corrupt Organizations<br>Conspiracy; 21 U.S.C. § 846:<br>Conspiracy to Possess with<br>Intent to Distribute and<br>Distribute Cocaine Base in the<br>form of Crack Cocaine; 21<br>U.S.C. §§ 841(a)(1),<br>(b)(1)(A)(iii) and<br>(b)(1)(B)(iii): Distribution<br>of Cocaine Base in the form of<br>Crack Cocaine; 18 U.S.C.<br>§ 1959(a)(1): Violent Crime in<br>Aid of Racketeering; 1956(h):<br>Conspiracy to Commit Money<br>Laundering; 18 U.S.C.<br>§§ 1956(a)(1): Money<br>Laundering; 18 U.S.C.<br>§ 1201(c): Conspiracy to<br>Commit Kidnaping; 18 U.S.C.<br>§ 1201(a)(1): Kidnaping; 18<br>U.S.C. § 2: Aiding and<br>Abetting and Causing an Act to<br>be Done] |

```
 1 ║ LUISA NAVARRO,                        )
   ║   aka "Diabla,"                       )
 2 ║ AGRIPINO MATEO,                       )
   ║   aka "Shadow,"                       )
 3 ║ LEONARDO MELGAREJO,                   )
   ║   aka "Stranger,"                     )
 4 ║ SAMUEL EDGAR GUERRA,                  )
   ║   aka "Sammy,"                        )
 5 ║ JAVIER PEREZ,                         )
   ║   aka "Ranger,"                       )
 6 ║ CIPRIANO ESTRADA,                     )
   ║   aka "Grumpy,"                       )
 7 ║ STEFANI BRIZUELA,                     )
   ║   aka "Raven,"                        )
 8 ║ DAVID GONZALEZ,                       )
   ║   aka "Lil Primo,"                    )
 9 ║ YOVANNI VELASQUEZ,                    )
   ║   aka "BG,"                           )
10 ║ JUVENAL CARDENAS MEJIA,               )
   ║   aka "Atlas,"                        )
11 ║ GUADALUPE RANGEL,                     )
   ║   aka "Barios,"                       )
12 ║ JANET GONZALEZ,                       )
   ║   aka "La Bullet,"                    )
13 ║ ARMANDO AREVALO,                      )
   ║   aka "Klumzy,"                       )
14 ║ ALEXANDER RIVERA,                     )
   ║   aka "Alex,"                         )
15 ║ JOSE ATUNEES,                         )
   ║   aka "Lobo,"                         )
16 ║ JENNY ALAS,                           )
   ║   aka "La Shorty,"                    )
17 ║ JAMES WOOTEN,                         )
   ║   aka "Crow,"                         )
18 ║ JOSE ALBERTO ALVARENGA                )
   ║ VILLEDA,                              )
19 ║   aka "Chepe,"                        )
   ║   aka "El Gordo,"                     )
20 ║   aka "El Señor,"                     )
   ║ LETY BERTOTTY HERNANDEZ,              )
21 ║   aka "La Señora,"                    )
   ║   aka "La Huera,"                     )
22 ║ ROXANA DELACRUZ RODRIGUEZ,            )
   ║   aka "Rox,"                          )
23 ║ APOLONIA RAMIREZ,                     )
   ║   aka "Reina,"                        )
24 ║ MARCO ANTONIO CAPETILLO,              )
   ║   aka "Chupon,"                       )
25 ║ MARCO ANTHONY FONSECA,                )
   ║ aka "Junior,"                         )
26 ║   aka "Primo,"                        )
   ║   aka "Catracho,"                     )
27 ║ MARCOS GONZALES,                      )
   ║   aka "Mudo,"                         )
28 ║
```

```
 1    ANTONIO DIAZ,                      )
        aka "Anibal Hernandez,"          )
 2      aka "Toño,"                      )
      EDI PINEDA RIVAS,                  )
 3      aka "Javier Garcia,"             )
        aka "El Zarco,"                  )
 4    JUAN VELAZQUEZ                     )
        aka "La Viuda," and              )
 5    FNU LNU,                           )
        aka "El Buki,"                   )
 6                                       )
                                         )
 7                      Defendants.      )
                                         )
 8    _____)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
```

3

1  The Grand Jury charges:

2                    INTRODUCTORY ALLEGATIONS

3  A.   RACKETEERING ENTERPRISE

4       1.   At all times relevant to this Indictment, defendants

5  SERGIO PANTOJA, also known as ("aka") "Tricky" ("PANTOJA"); ISAAC

6  GUILLEN, aka "Coach" ("GUILLEN"); INGRID VERONICA TERCERO, aka

7  "Morena," aka "More" ("TERCERO"); JOSE GUADALUPE DELAGUILA, aka

8  "Skipper" ("DELAGUILA"); SALVADOR RUIZ, aka "Shaggie" ("RUIZ");

9  EDUARDO HERNANDEZ, aka "Oso," aka "Terco" ("EDUARDO HERNANDEZ");

10  JOSE CRUZ SALDANA, aka "Tiger" ("SALDANA"); JUAN PABLO MURILLO,

11  aka "Face" ("MURILLO"); VLADIMIR IRAHETA, aka "Jokes," aka

12  "Slick," aka "the Twin" ("V. IRAHETA"); LEONIDAS IRAHETA, aka

13  "Druggy," aka "Drugs," aka "the Twin," aka "Shysty" ("L.

14  IRAHETA"); DAVID RODRIGUEZ, aka "Player" ("D. RODRIGUEZ"); LUISA

15  NAVARRO, aka "Diabla" ("NAVARRO"); AGRIPINO MATEO, aka "Shadow"

16  ("MATEO"); LEONARDO MELGAREJO, aka "Stranger" ("MELGAREJO");

17  SAMUEL EDGAR GUERRA, aka "Sammy" ("GUERRA"); JAVIER PEREZ, aka

18  "Ranger" ("PEREZ"); CIPRIANO ESTRADA, aka "Grumpy" ("ESTRADA");

19  STEFANI BRIZUELA, aka "Raven" ("BRIZUELA"); DAVID GONZALEZ, aka

20  "Lil Primo" ("D. GONZALEZ"); YOVANNI VELASQUEZ, aka "BG" ("Y.

21  VELASQUEZ"); JUVENAL CARDENAS MEJIA, aka "Atlas" ("MEJIA"); JANET

22  GONZALEZ, aka "La Bullet" ("J. GONZALEZ"); ARMANDO AREVALO, aka

23  "Klumzy" ("AREVALO"); ALEXANDER RIVERA, aka "Alex" ("RIVERA");

24  JOSE ATUNEES, aka "Lobo" ("ATUNEES"); JENNY ALAS, aka "La Shorty"

25  ("ALAS"); and GUADALUPE RANGEL, aka "Barios" ("RANGEL"), and

26  others known and unknown to the Grand Jury, were members and

27  associates of an organization, hereinafter referred to as the

28  "CLCS Organization," an enterprise, that was engaged in, among

                                  4

1  other things, murder, extortion, robbery, kidnaping, money
2  laundering, witness intimidation, and narcotics trafficking.  At
3  all relevant times, the CLCS Organization was comprised of
4  members and associates of the Columbia Lil Cycos ("CLCS") clique
5  of the 18th Street Gang, and it operated in the Central District
6  of California and elsewhere.  The CLCS Organization, including
7  its leadership, membership and associates, constituted an
8  "enterprise," as defined by Title 18, United States Code, Section
9  1961(4), that is, a group of individuals associated in fact,
10  although not a legal entity, which is engaged in, and the
11  activities of which affected, interstate commerce.  The
12  enterprise constituted an ongoing organization whose members and
13  associates functioned as a continuing unit for a common purpose
14  of achieving the objectives of the enterprise.
15  B.    GENERAL BACKGROUND
16       2.  The Mexican Mafia, often referred to as "la EME"
17  (derived from the Spanish pronunciation of the letter "M"), is a
18  criminal organization that operates within the California state
19  prison system and, to a lesser extent, the federal prison system.
20  Members of the Mexican Mafia, commonly referred to as "big
21  homies," "tios" (Spanish for "uncles"), and/or "padrino" (slang
22  for "godfather"), come from the ranks of local Southern
23  California street gangs, including the 18th Street Gang.  By
24  controlling the criminal activities occurring within prison
25  facilities, providing protection for members and associates of
26  imprisoned Hispanic gangs, and imposing discipline, often in the
27  form of acts of violence, against both individuals and gangs who
28  fail to adhere to its directives, the Mexican Mafia has risen to

5

the position where it now exercises control over the Hispanic street gangs of Southern California, including the 18th Street Gang.  The Mexican Mafia charges the street gangs under its control a specified sum of money to be paid on a regular basis, known as "taxes" or "rent" ("rent"), which is payable to the Mexican Mafia member designated to oversee the particular clique, or subset, of the gang.  In return for such payments, the cliques receive the Mexican Mafia's authorization to control the criminal activities occurring within the clique's territory free of interference or competition from other cliques, as well as protection for gang members who are incarcerated.  Failure to pay either the requisite rent or to adhere to the Mexican Mafia's directives will result in the clique being penalized by the Mexican Mafia, which can include having violence directed at either individual members of the clique or the clique as a whole.

3.  The 18th Street Gang is a broad-based criminal street gang that originated in the Los Angeles area and that is comprised of numerous cliques.  The CLCS Organization operates in areas west of downtown Los Angeles near MacArthur Park under the ultimate authority and direction of an unindicted co-conspirator (Mexican Mafia Member 1).  Mexican Mafia Member 1, who is incarcerated in federal prison, exercises control over the CLCS Organization with the assistance of intermediaries who facilitate his receipt of rent payments and either communicate or assist in the communication of Mexican Mafia Member 1's directives to the CLCS Organization's leadership.

4.  The CLCS Organization is controlled principally by senior members, or leaders, who are known in gang terms as "shot

6

callers." Shot callers are responsible for, among other things,
generating revenue by managing the drug trafficking in CLCS
Organization territory; collecting extortion payments, commonly
referred to as rent, from individuals conducting activities
within CLCS Organization territory; enforcing Mexican Mafia
Member 1's directives and CLCS Organization rules; resolving
intra-clique disputes; recruiting associates, including members
of other 18th Street Gang cliques, to assist the CLCS
Organization in achieving its objectives; and ensuring that
Mexican Mafia Member 1 receives the rent payments that he
demands.

    5.   The CLCS Organization generates revenue primarily by
controlling the drug trafficking occurring within its territory.
It does so through a system whereby CLCS Organization-approved
drug wholesalers, known as "mayoristas," and street level
dealers, known as "traqueteros," are permitted to conduct
narcotics sales, primarily involving cocaine base in the form of
crack cocaine ("crack cocaine"), within CLCS Organization
territory, with protection from rivals and without other
interference, in return for providing the CLCS Organization with
regular payments of a designated percentage of the proceeds of
their narcotics sales. Like the required payments to the Mexican
Mafia, these payments are commonly referred to as rent or taxes.

    6.   The CLCS Organization also generates revenue by taxing
other illegal activity occurring within its territory, including
the trafficking of fraudulent documents by street dealers known
as "miqueros" and the sale of goods by street vendors, as well as
through a wide array of crimes committed by CLCS Organization

1  members and associates, including extortion and robbery.

2          7.  The CLCS Organization, through its members and

3  associates, takes steps to conceal and disguise its criminal

4  activities from law enforcement including the proceeds generated

5  from its illegal conduct.  For example, members and associates of

6  the CLCS Organization regularly used coded language to disguise

7  the content of telephone communications relating to illegal

8  conduct and frequently converted narcotics proceeds and rent

9  collections into money orders, which are used for numerous

10  purposes, including, but not limited to: (a) transferring funds

11  to Mexican Mafia Member 1 and others known and unknown to the

12  Grand Jury; (b) using money orders to promote the enterprise's

13  financial interests; and (c) using money orders to conceal the

14  nature and origin of the narcotics proceeds and rent collections

15  generated by the enterprise.

16          8.  Individuals who impede the CLCS Organization's efforts

17  to generate revenue, including the collection of rent imposed on

18  drug traffickers and street vendors, or who otherwise disregard

19  its directives, are subject to discipline and/or retribution from

20  CLCS Organization members and associates, which can include

21  monetary fines, threats, and acts of violence.

22          9.  By participating in CLCS Organization-directed

23  activities and adhering to CLCS Organization directives, members

24  and associates are able to maintain and increase their standing

25  with the CLCS Organization.  This is particularly true for acts

26  of violence committed at the direction, and on behalf, of the

27  CLCS Organization, which not only maintains and increases the

28  standing of the individual who executed the act but also

8

maintains and increases the CLCS Organization's control of its territory by reinforcing its reputation for intimidation and violence.

C.    THE PARTIES

10.    The members of the CLCS Organization and their associates constitute an enterprise, referred to herein as the "CLCS Organization," or the "enterprise."  The word "member" below refers to a member of the CLCS clique.  Individuals affiliated with the CLCS Organization and who assist its members, including members of other cliques of the 18th Street Gang, are referred to as "associates" of the CLCS Organization.  Both members of the CLCS clique and their associates are participants in the CLCS Organization.

11.    Mexican Mafia Member 1 is the Mexican Mafia member who has been given authority to supervise and control the activities of the CLCS Organization.  Incarcerated for life at the federal maximum security prison at Florence, Colorado ("ADX-Florence"), Mexican Mafia Member 1 controls the CLCS Organization with the help of defendant GUILLEN and others, who facilitate communications and money transfers between Mexican Mafia Member 1 and the CLCS Organization.

12.    Defendant DELAGUILA served as the CLCS Organization shot caller from in or about 2001 to 2002.  DELAGUILA served as the 18th Street Gang's liaison to the Mexican Mafia from that time until approximately 2006, and during such time continued to hold a position of leadership within the CLCS Organization.

13.    Defendant RUIZ served as the CLCS Organization shot caller from in or about 2002 to 2003, after which time he served

1  as a liaison between Mexican Mafia Member 1, the CLCS

2  Organization, and other cliques of the 18th Street Gang operating

3  under the authority of Mexican Mafia Member 1.

4       14.  Defendant PANTOJA was the shot caller of the CLCS

5  Organization from in or about 2005 through 2007.  As shot caller,

6  PANTOJA used violence and intimidation to control, oversee, and

7  direct the distribution of narcotics and the collection of rent

8  from drug traffickers, miqueros, and street vendors operating

9  within CLCS Organization territory.  PANTOJA also was accountable

10  for the delivery of CLCS Organization rent proceeds to defendant

11  GUILLEN, who subsequently delivered the money to Mexican Mafia

12  Member 1 or his designees.

13       15.  Defendant TERCERO is a member of the 18th Street Gang

14  and defendant PANTOJA's wife.  TERCERO closely assisted PANTOJA

15  in overseeing all aspects of narcotics distribution in CLCS

16  Organization territory, including directing and coordinating the

17  purchase of narcotics from wholesale suppliers for distribution

18  to street dealers, the collection of money from street dealers

19  that was used to purchase narcotics from wholesale suppliers, the

20  collection of rent from street dealers, and the delivery of rent

21  to Mexican Mafia Member 1 via defendant GUILLEN.

22       16.  Defendant GUILLEN is an attorney and CLCS Organization

23  associate who acts as a liaison between Mexican Mafia Member 1

24  and CLCS Organization leadership by delivering the CLCS

25  Organization's rent payments to Mexican Mafia Member 1 and by

26  relaying orders from Mexican Mafia Member 1 to the CLCS

27  Organization.  GUILLEN and Mexican Mafia Member 1 are partners in

28  several businesses, including a limousine service, a liquor

1    distributor, and a real estate holding corporation.

2        17.   Defendant SALDANA is a member of the CLCS Organization

3    who assisted defendants PANTOJA and TERCERO with the distribution

4    of narcotics in CLCS Organization territory, including the

5    distribution of narcotics from wholesale suppliers to street

6    dealers, the collection of money from street dealers that was

7    used to purchase narcotics from wholesale suppliers, and the

8    collection of rent from street dealers engaged in the sale of

9    narcotics.

10       18.   Defendants EDUARDO HERNANDEZ, V. IRAHETA, L. IRAHETA,

11   D. RODRIGUEZ, NAVARRO, MATEO, MELGAREJO, and ESTRADA are CLCS

12   Organization members who collected rent and enforced CLCS

13   Organization control of its territory by means of extortion,

14   violence, and threats of violence.

15       19.   Defendant J. GONZALEZ is a CLCS Organization member who

16   distributed narcotics, assisted in enforcing CLCS Organization

17   control of its territory, and facilitated communications between

18   other members of the CLCS Organization and Mexican Mafia Member

19   1.

20       20.   Defendant GUERRA is a CLCS Organization associate who

21   was a wholesale distributor of marijuana for the CLCS

22   Organization and who collected rent for the CLCS Organization

23   from street narcotics dealers and miqueros operating in CLCS

24   Organization territory.

25       21.   Defendant MURILLO is a CLCS Organization associate and

26   a member of the South Central clique of the 18th Street Gang.

27   Under the direction of defendant PANTOJA, MURILLO distributed

28   narcotics, collected rent from street dealers engaged in the sale

11

1  of narcotics, extorted rent from shop owners and street vendors
2  engaged in commerce in CLCS Organization territory, and enforced
3  CLCS Organization control of its territory through intimidation,
4  threats of violence, and actual violence.   In 2007, MURILLO took
5  over control of CLCS Organization narcotics trafficking
6  activities from PANTOJA.

7      22.   Defendant PEREZ is a CLCS Organization associate and a
8  member of the South Central clique of the 18th Street Gang, who
9  assisted defendant MURILLO under the direction of defendant
10  PANTOJA in enforcing CLCS Organization control of its territory
11  through intimidation, threats of violence, and actual violence.

12      23.   Defendants BRIZUELA, AREVALO, and RIVERA are CLCS
13  Organization associates who assisted other CLCS Organization
14  members with rent collection and the enforcement of CLCS
15  Organization control of its territory.

16      24. Defendant ALAS is a CLCS Organization associate and
17  member of the Grand View Locos clique of the 18th Street Gang who
18  distributed narcotics on behalf of the CLCS Organization and
19  assisted in enforcing CLCS Organization control of its territory.

20      25.   Defendants D. GONZALEZ, Y. VELASQUEZ, MEJIA, ATUNEES,
21  and RANGEL are CLCS Organization associates who distributed
22  narcotics, collected rent from street dealers who engaged in the
23  sale of narcotics, extorted rent from shop owners and street
24  vendors who engaged in commerce in CLCS Organization territory,
25  and enforced CLCS Organization control of its territory through
26  intimidation, threats of violence, and actual violence.

27  D.   PURPOSES OF THE ENTERPRISE
28      26.   The purposes of the CLCS Organization include, but are

12

1  not limited to, the following:

2          a.   Enriching the members and associates of the

3  enterprise through, among other things, the distribution of

4  narcotics; the collection of rent from narcotics traffickers,

5  miqueros, and street vendors; and the commission of financially-

6  oriented crimes such as robbery.

7          b.   Maintaining control over all CLCS Organization

8  territory.

9          c.   Preserving, protecting, and expanding the power and

10 profits of the enterprise through the use of fines, intimidation,

11 threats of violence, and actual acts of violence.

12         d.   Promoting and enhancing the enterprise and the

13 activities of its members and associates.

14 E.   MEANS AND METHODS OF THE ENTERPRISE

15      27.  Among the means and methods by which the defendants and

16 other members and associates of the CLCS Organization participate

17 in the conduct of the affairs of the enterprise are the

18 following:

19         a.   Members of the CLCS Organization use the enterprise

20 to impose fines and to commit, and attempt and threaten to

21 commit, acts of violence to protect and expand the enterprise's

22 criminal operations.  Members of the CLCS Organization further

23 use the enterprise to promote a climate of intimidation and fear

24 through violence and threats of violence.

25         b.   Members of the CLCS Organization promulgate certain

26 rules to be followed by all members and associates of the

27 enterprise, including the rule that members and associates of the

28 enterprise may not act as informants to law enforcement

13

authorities regarding the illegal activities of the enterprise.

        c.   To generate income, members and associates of the CLCS Organization are "entitled" to conduct, and in fact do conduct, illegal activities under the protection of the enterprise.   This includes participating in drug trafficking, committing robberies, and collecting rent from narcotics traffickers, miqueros, and street vendors who operate within CLCS Organization territory.

        e.   The CLCS Organization pays taxes or rent to the Mexican Mafia in order to ensure protection for its incarcerated members and associates and to obtain continued authorization permitting it to exercise exclusive control over its territory and the criminal conduct occurring therein.

        f.   To perpetuate the CLCS Organization, members and associates of the enterprise attempt to conceal from law enforcement the existence of the CLCS Organization, the identity of its participants, the ways in which it conducts its affairs, and the locations at which it discusses and conducts its affairs.

COUNT ONE

[18 U.S.C. § 1962(d)]

1.   Paragraphs 1 through 27 of the Introductory Allegations of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.   Beginning on a date unknown to the Grand Jury and continuing until in or about September 2008, in Los Angeles County, within the Central District of California, and elsewhere, defendants PANTOJA, GUILLEN, TERCERO, DELAGUILA, RUIZ, EDUARDO HERNANDEZ, SALDANA, MURILLO, V. IRAHETA, L. IRAHETA, D. RODRIGUEZ, NAVARRO, MATEO, MELGAREJO, GUERRA, ESTRADA, BRIZUELA, D. GONZALEZ, Y. VELASQUEZ, MEJIA, RANGEL, J. GONZALEZ, AREVALO, RIVERA, ATUNEES, ALAS, and PEREZ, and others known and unknown to the Grand Jury, being persons employed by and associated with the CLCS Organization, an enterprise, as more fully described in Paragraphs One through Twenty-Seven of the Introductory Allegations of this Indictment, which engaged in, and the activities of which affected, interstate and foreign commerce, unlawfully and knowingly combined, conspired, confederated, and agreed together to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of multiple acts indictable under the following provisions of federal law:

A.   18 U.S.C. § 1512 (witness intimidation);

B.   18 U.S.C. § 1956 (money laundering);

1    C.   21 U.S.C. § 841(a)(1) (possession with intent to
2         distribute/distribution/aiding and abetting the
3         distribution of illegal controlled substances);

4    D.   21 U.S.C. § 846 (narcotics conspiracy);

5  and multiple acts involving:

6    E.   murder, in violation of California Penal Code Sections
7         21(a), 31, 182, 187, 189, and 664;

8    F.   extortion, in violation of California Penal Code
9         Sections 519 and 524; and

10   G.   robbery, in violation of California Penal Code Section
11        211.

12       It was a further part of the conspiracy that each of the
13  above-named defendants agreed that a co-conspirator would commit
14  at least two acts of racketeering in the conduct of the affairs
15  of the enterprise.

16  A.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE
17       ACCOMPLISHED

18       The objects of the conspiracy were to be accomplished in
19  substance as follows:

20       3.   Defendants PANTOJA, TERCERO, DELAGUILA, and RUIZ, and
21  others known and unknown to the Grand Jury, would identify and
22  recruit wholesale narcotics suppliers and street narcotics
23  dealers to engage in the distribution and sale of narcotics in
24  CLCS Organization territory.

25       4.   Defendants PANTOJA, TERCERO, DELAGUILA, and RUIZ, and
26  others known and unknown to the Grand Jury, would negotiate
27  prices and quantities of narcotics, including crack cocaine, to
28  be distributed among wholesale suppliers and street dealers
    selling narcotics in CLCS Organization territory.

16

5.   Defendants PANTOJA, TERCERO, SALDANA, MURILLO, D.
RODRIGUEZ, NAVARRO, MATEO, GUERRA, Y. VELASQUEZ, J. GONZALEZ,
AREVALO, RIVERA, and ALAS, and others known and unknown to the
Grand Jury, would possess with intent to distribute and
distribute narcotic controlled substances, including cocaine base
in the form of crack cocaine.

6.   Defendants PANTOJA, TERCERO, DELAGUILA, RUIZ, EDUARDO
HERNANDEZ, SALDANA, D. RODRIGUEZ, and GUERRA, and others known
and unknown to the Grand Jury, would inform street narcotics
dealers that they were required to obtain specific quantities of
narcotics exclusively from wholesalers and suppliers designated
by the CLCS Organization.

7.   Defendants PANTOJA, TERCERO, DELAGUILA, RUIZ, EDUARDO
HERNANDEZ, SALDANA, MURILLO, D. RODRIGUEZ, GUERRA, AREVALO, and
RIVERA, and others known and unknown to the Grand Jury, would
instruct the wholesale and street narcotics dealers that they
were required to pay rent, typically a portion of their proceeds
from the sales of narcotics, to the CLCS Organization in order to
continue their narcotics trafficking activities in CLCS
Organization territory, with the protection of the CLCS
Organization from competition or interference from rival
narcotics dealers, robbers, and other gangs, and that the failure
to do so would result in retribution, including fines and acts of
violence, directed at them by the CLCS Organization.

8.   Defendants PANTOJA, TERCERO, DELAGUILA, RUIZ, EDUARDO
HERNANDEZ, SALDANA, MURILLO, D. RODRIGUEZ, GUERRA, AREVALO, and
RIVERA, and others known and unknown to the Grand Jury, would
collect rent at regular intervals from narcotics wholesalers and

17

street narcotics dealers in CLCS Organization territory.

9.   Defendants PANTOJA, SALDANA, MURILLO, Y. VELASQUEZ, MEJIA, RANGEL, and ATUNEES, and others known and unknown to the Grand Jury, would use intimidation, threats of violence, and actual violence in order to demand that shop owners and street vendors engaged in commerce in CLCS Organization territory pay rent to the CLCS Organization, in exchange for which they were allowed to operate their businesses within CLCS Organization territory without interference from the CLCS Organization.  Rent collected from the narcotics traffickers and extorted from street vendors and shop owners would be delivered to the CLCS Organization shot callers, including but not limited to, defendants PANTOJA, DELAGUILA, and RUIZ.

10.   Defendants PANTOJA, DELAGUILA, and RUIZ, and others known and unknown to the Grand Jury, would deliver, or cause to be delivered, a portion of the CLCS Organization rent proceeds to Mexican Mafia Member 1, through his designated intermediaries, including defendant GUILLEN.

11.   Defendant GUILLEN and his co-conspirators would receive rent in the form of narcotic proceeds and other illegally obtained proceeds from the CLCS Organization, and transfer the money by money order or other means to Mexican Mafia Member 1's prison account and/or his designees, including, but not limited to, other members of the Mexican Mafia.

12.   Defendants would enforce their control over the commerce and criminal activities conducted in CLCS Organization territory by employing intimidation, violence, and threats of violence against individuals who did not comply with CLCS

1   Organization directives.  Defendants PANTOJA, DELAGUILA, RUIZ,

2   and EDUARDO HERNANDEZ, and others known and unknown to the Grand

3   Jury, would either engage in such enforcement acts directly, or

4   order subordinate CLCS Organization members and associates to

5   carry out such enforcement acts.  Defendants MURILLO, V. IRAHETA,

6   L. IRAHETA, D. RODRIGUEZ, NAVARRO, MATEO, MELGAREJO, PEREZ,

7   ESTRADA, BRIZUELA, D. GONZALEZ, Y. VELASQUEZ, MEJIA, J. GONZALEZ,

8   ATUNEES, ALAS, and RANGEL, and others known and unknown to the

9   Grand Jury, would execute such enforcement actions, under the

10  direction of CLCS Organization shot callers or other CLCS

11  Organization members authorized by CLCS Organization shot callers

12  to direct such enforcement actions.

13      13.  Defendants PANTOJA, GUILLEN, TERCERO, DELAGUILA, RUIZ,

14  EDUARDO HERNANDEZ, SALDANA, MURILLO, V. IRAHETA, L. IRAHETA, D.

15  RODRIGUEZ, NAVARRO, MATEO, MELGAREJO, GUERRA, PEREZ, ESTRADA,

16  BRIZUELA, D. GONZALEZ, Y. VELASQUEZ, MEJIA, J. GONZALEZ, AREVALO,

17  RIVERA, ATUNEES, ALAS, and RANGEL, and others known and unknown

18  to the Grand Jury, would further maintain the CLCS Organization's

19  control of its territory by engaging in acts of intimidation,

20  threats of violence, and actual violence against individuals who

21  were, or who were perceived by the CLCS Organization members to

22  be, members of rival gangs to the 18th Street Gang or the CLCS

23  Organization, to prevent those gangs from encroaching on CLCS

24  Organization territory, conducting narcotics trafficking or

25  criminal activities in CLCS Organization territory, or otherwise

26  competing with the criminal operations of the enterprise.

27      14.  Defendants PANTOJA, GUILLEN, TERCERO, DELAGUILA, RUIZ,

28  EDUARDO HERNANDEZ, SALDANA, MURILLO, V. IRAHETA, L. IRAHETA, D.

19

1  RODRIGUEZ, NAVARRO, MATEO, MELGAREJO, GUERRA, ESTRADA, BRIZUELA,

2  Y. VELASQUEZ, MEJIA, J. GONZALEZ, AREVALO, RIVERA, ATUNEES, ALAS,

3  and RANGEL, and others known and unknown to the Grand Jury, would

4  further maintain the CLCS Organization's control of its territory

5  by allying the CLCS Organization with the Mexican Mafia, and

6  paying "taxes" to the Mexican Mafia in return for the Mexican

7  Mafia's protection and authorization to control narcotics

8  trafficking and other illegal activities in CLCS Organization

9  territory.

10      15.  Through the collection of rent and the control of

11  commerce and criminal activity in CLCS Organization territory,

12  defendants PANTOJA, GUILLEN, TERCERO, DELAGUILA, RUIZ, EDUARDO

13  HERNANDEZ, SALDANA, MURILLO, V. IRAHETA, L. IRAHETA, D.

14  RODRIGUEZ, NAVARRO, MATEO, MELGAREJO, GUERRA, ESTRADA, BRIZUELA,

15  Y. VELASQUEZ, MEJIA, J. GONZALEZ, AREVALO, RIVERA, ATUNEES, ALAS,

16  and RANGEL, and others known and unknown to the Grand Jury,

17  operated an enterprise generating significant proceeds from

18  narcotics trafficking and other illegal activity in CLCS

19  Organization territory.  The proceeds of the narcotics

20  trafficking and other illegal activities controlled by the CLCS

21  Organization generated profits for the CLCS Organization and its

22  individual members and associates.

23  B.  OVERT ACTS

24      16.  In furtherance of the racketeering conspiracy and to

25  accomplish its objects, defendants PANTOJA, GUILLEN, TERCERO,

26  DELAGUILA, RUIZ, EDUARDO HERNANDEZ, SALDANA, MURILLO, V. IRAHETA,

27  L. IRAHETA, D. RODRIGUEZ, NAVARRO, MATEO, MELGAREJO, GUERRA,

28  PEREZ, ESTRADA, BRIZUELA, D. GONZALEZ, Y. VELASQUEZ, MEJIA, J.

1   GONZALEZ, AREVALO, RIVERA, ATUNEES, ALAS, and RANGEL, and others

2   known and unknown to the Grand Jury, committed various overt

3   acts, in Los Angeles County, within the Central District of

4   California, and elsewhere, including, but not limited to, the

5   following, on or about the dates set forth below:

6           (1)   On July 21, 2001, defendants EDUARDO HERNANDEZ, L.

7   IRAHETA, and V. IRAHETA shot and killed J.B.

8           (2)   On July 21, 2001, defendants EDUARDO HERNANDEZ, L.

9   IRAHETA, and V. IRAHETA shot and wounded A.H.

10          (3)   On or about January 19, 2002, defendant V. IRAHETA

11  attacked a car occupied by individuals not associated with the

12  CLCS Organization that encroached upon CLCS Organization

13  territory, by throwing a hard object into the window of the

14  vehicle and yelling, "Where are you from?"

15          (4)   On October 30, 2002, defendant L. IRAHETA

16  possessed a loaded firearm while in CLCS Organization territory

17  with defendant MELGAREJO.

18          (5)   On October 31, 2002, defendant MATEO possessed and

19  distributed crack cocaine in CLCS Organization territory.

20          (6)   On August 19, 2003, defendants L. IRAHETA and

21  EDUARDO HERNANDEZ collected rent from CLCS Organization member

22  A.S. in CLCS Organization territory.

23          (7)   On March 27, 2004, defendant ESTRADA committed a

24  robbery, during which he asked the victims, "What gang are you

25  from?" and thereafter fled to a known CLCS Organization meeting

26  place.

27          (8)   On June 9, 2004, defendant MATEO distributed

28  narcotics in CLCS Organization territory.

1          (9)   On February 16, 2005, at his home in CLCS

2    Organization territory, defendant RIVERA possessed approximately

3    3.56 grams of crack cocaine, approximately $2,409 in United

4    States currency, a loaded Walther PPK .380 semi-automatic

5    handgun, and multiple rounds of .380 caliber ammunition.

6          (10)   On March 8, 2005, CLCS Organization member James

7    Anthony Villalobos ("Villalobos") collected rent money from

8    defendant GUERRA in CLCS Organization territory, which Villalobos

9    then attempted to deliver to defendant DELAGUILA.

10          (11)   On June 14, 2005, defendant MELGAREJO, using

11   racial slurs and invoking 18th Street Gang authority, attempted

12   to collect rent from African-American individuals living in CLCS

13   Organization territory.

14          (12)   On June 29, 2005, defendant PANTOJA delivered

15   rent money to defendant DELAGUILA.

16          (13)   On July 13, 2005, defendant GUERRA extorted $600

17   from a store owner in CLCS Organization territory.

18          (14)   On July 15, 2005, defendant GUERRA forced a store

19   owner operating in CLCS Organization territory to allow a CLCS

20   Organization narcotics street dealer to sell narcotics outside of

21   the store.

22          (15)   On July 20, 2005, defendant GUERRA extorted $200

23   from a store owner whose business was located in CLCS

24   Organization territory.

25          (16)   On July 23, 2005, defendant D. RODRIGUEZ

26   committed an armed robbery in 18th Street Gang territory, on the

27   border of CLCS Organization territory and the territory of the

28   rival "Rockwood" gang.


                                  22

1          (17)  On August 1, 2005, defendant PANTOJA ordered

2  defendant NAVARRO and other 18th Street Gang members to assault

3  two individuals present in a laundromat in CLCS Organization

4  territory who PANTOJA believed were members of a rival gang.

5          (18)  On August 1, 2005, pursuant to orders from

6  defendant PANTOJA, defendant NAVARRO and other 18th Street Gang

7  members assaulted D.R.V. and W.V., who was visibly pregnant at

8  the time, in a laundromat in CLCS Organization territory and told

9  them to get out of CLCS Organization territory.

10         (19)  On September 10, 2005, defendant D. RODRIGUEZ

11  possessed narcotics for sale and narcotics proceeds in CLCS

12  Organization territory.

13         (20)  On October 13, 2005, defendant EDUARDO HERNANDEZ

14  harbored in CLCS Organization territory notorious fugitive 18th

15  Street Gang member W.V., aka "Crook," who was the subject of a

16  state arrest arising from his involvement in multiple homicides

17  committed on behalf of the 18th Street Gang.

18         (21)  On October 15, 2005, Villalobos paid defendant

19  DELAGUILA $2,500 to be allowed to step down as shot caller of the

20  CLCS Organization without being assaulted.

21         (22)  On December 28, 2005, defendants V. IRAHETA and

22  EDUARDO HERNANDEZ violated a State of California gang injunction

23  by associating with fellow CLCS Organization members in CLCS

24  Organization territory.

25         (23)  On January 9, 2006, CLCS Organization members

26  defendants EDUARDO HERNANDEZ, L. IRAHETA, and V. IRAHETA attended

27  a CLCS Organization meeting with approximately six other CLCS

28  Organization members at the home of CLCS Organization member F.E.

1    (24)   On April 6, 2006, in defendant PANTOJA's tattoo
2  shop located in CLCS Organization territory, PANTOJA and
3  defendant ESTRADA, using coded language, discussed 18th Street
4  Gang business, including rent collections and setting up new
5  cliques of the 18th Street Gang.

6    (25)   On April 11, 2006, defendant PANTOJA met with
7  defendant RIVERA and others inside PANTOJA's tattoo shop, and,
8  using coded language, discussed how he was a member of the CLCS
9  Organization and further discussed the distribution of narcotics
10  within CLCS Organization territory.

11    (26)   On April 13, 2006, in CLCS Organization
12  territory, defendant TERCERO, acting at the direction of and in
13  concert with defendant PANTOJA, possessed narcotics for sale.

14    (27)   On April 14, 2006, in defendant PANTOJA's tattoo
15  shop, using coded language, PANTOJA discussed the distribution of
16  narcotics and CLCS Organization business, including PANTOJA's
17  need for additional narcotics dealers to sell in CLCS
18  Organization territory, and the quality, quantity, and price of
19  crack cocaine that PANTOJA would supply to narcotics traffickers
20  in CLCS Organization territory.

21    (28)   On April 18, 2006, in defendant PANTOJA's tattoo
22  shop, PANTOJA directed a cooperating witness ("CW-2") to pay $400
23  per week in rent in exchange for the right to distribute
24  narcotics in CLCS Organization territory, and to tell anyone who
25  challenged CW-2 that CW-2 had authorization from PANTOJA to sell
26  narcotics in CLCS Organization territory.

27    (29)   On April 18, 2006, in CLCS Organization
28  territory, defendant TERCERO, acting at the direction of and in

24

1    concert with defendant PANTOJA, possessed narcotics for sale.

2         (30)  On April 19, 2006, in CLCS Organization

3    territory, defendant TERCERO, acting at the direction of and in

4    concert with defendant PANTOJA, possessed narcotics for sale.

5         (31)  On April 25, 2006, in defendant PANTOJA's tattoo

6    shop, PANTOJA collected $400 in rent from CW-2.

7         (32)  On April 26, 2006, defendant MELGAREJO carried a

8    loaded handgun in 18th Street Gang territory.

9         (33)  On April 27, 2006, Mexican Mafia Member 1 sent a

10   letter to defendant RUIZ, stating that the money order RUIZ sent

11   to Mexican Mafia Member 1 had been returned, and that the 18th

12   Street Gang members should make peace because that is the way

13   Mexican Mafia Member 1 wanted it to be.

14        (34)  On May 2, 2006, in defendant PANTOJA's tattoo

15   shop, PANTOJA collected $400 in rent from CW-2.

16        (35)  On May 2, 2006, in CLCS Organization territory,

17   defendant TERCERO, acting at the direction of and in concert with

18   defendant PANTOJA, possessed narcotics for sale.

19        (36)  On May 2, 2006, using coded language, defendant

20   PANTOJA discussed how to package crack cocaine so that it could

21   be swallowed to avoid law enforcement detection.

22        (37)  On May 8, 2006, Mexican Mafia Member 1 sent a

23   letter to defendant RUIZ instructing RUIZ that CLCS Organization

24   members should not falsely invoke the authority of the Mexican

25   Mafia for infighting.  Using coded language, Mexican Mafia Member

26   1 further told RUIZ not to interfere with defendant PANTOJA's

27   work if he was not willing to help PANTOJA, to inform PANTOJA

28   that Mexican Mafia Member 1 would back him up as long as PANTOJA

25

1   paid taxes to Mexican Mafia Member 1, and to assemble a meeting
2   of shot callers for the cliques of the 18th Street Gang under
3   Mexican Mafia Member 1's control in order to stop infighting and
4   to unite their efforts on behalf of the 18th Street Gang and the
5   Mexican Mafia.
6          (38)  On May 12, 2006, defendant RUIZ wrote a letter to
7   Mexican Mafia Member 1, in which he addressed Mexican Mafia
8   Member 1 as "padrino," and further noted that he had done
9   everything possible to please Mexican Mafia Member 1 since
10  receiving Mexican Mafia Member 1's letter and would continue
11  doing whatever Mexican Mafia Member 1 asked of him, including
12  making amends between members of the various cliques of the 18th
13  Street Gang under Mexican Mafia Member 1's control.
14         (39)  On May 17, 2006, in defendant PANTOJA's tattoo
15  shop, PANTOJA collected $400 in rent from CW-2.
16         (40)  On May 17, 2006, defendant PANTOJA stated to
17  another member of the 18th Street Gang that the Mexican Mafia had
18  given PANTOJA "the keys" (i.e., control) of all 18th Street Gang
19  territories west of downtown Los Angeles, which included control
20  of the distribution of crack cocaine in CLCS Organization
21  territory.
22         (41)  On June 17, 2006, defendant RUIZ wrote a letter
23  to Mexican Mafia Member 1 in which he gave Mexican Mafia Member 1
24  telephone numbers Mexican Mafia Member 1 could use to reach RUIZ,
25  and RUIZ asked Mexican Mafia Member 1 to send a picture of
26  himself to RUIZ.
27         (42)  On July 26, 2006, defendants PANTOJA and TERCERO
28  sold narcotics in CLCS Organization territory.

26

1          (43)   On July 26, 2006, in defendant PANTOJA's tattoo

2    shop, PANTOJA collected $400 in rent from CW-2.

3          (44)   On July 26, 2006, in CLCS Organization territory,

4    narcotics street dealer Marco Anthony Fonseca, aka "Junior," aka

5    "Primo," aka "Catracho" ("Fonseca"), acting at the direction of

6    and in concert with defendants PANTOJA and TERCERO, possessed

7    approximately 31.7 grams of crack cocaine that PANTOJA, TERCERO,

8    and Fonseca sold to CW-2.

9          (45)   On August 13, 2006, defendant PANTOJA wrote a

10   letter to Mexican Mafia Member 1 in which he provided Mexican

11   Mafia Member 1 with his contact information, and, using coded

12   language, advised Mexican Mafia Member 1 that he and other shot

13   callers of the 18th Street Gang were acting in concert to further

14   the business of the Mexican Mafia and 18th Street Gang.

15         (46)   On August 14, 2006, defendant PANTOJA directed an

16   individual to pay rent in exchange for permission to sell

17   narcotics in CLCS Organization territory.

18         (47)   On August 15, 2006, defendant PANTOJA collected

19   $800 in rent from CW-2 in PANTOJA's tattoo shop.

20         (48)   On August 31, 2006, Mexican Mafia Member 1 wrote

21   a letter to defendant PANTOJA stating that he did not want to

22   hear any excuses as to why PANTOJA did not write to Mexican Mafia

23   Member 1 and instructing PANTOJA to dedicate himself to becoming

24   a Mexican Mafia member.

25         (49)   On September 13, 2006, using coded language,

26   defendant PANTOJA and CLCS Organization member Edgar Hernandez

27   discussed arrangements for Edgar Hernandez to deliver rent from

28   PANTOJA to defendant GUILLEN.

1          (50)   On September 13, 2006, using coded language,

2    defendant PANTOJA and Edgar Hernandez discussed Edgar Hernandez's

3    efforts to deliver rent to defendant GUILLEN.

4          (51)   On September 14, 2006, using coded language,

5    defendant PANTOJA told Edgar Hernandez to deliver rent money to

6    PANTOJA, and that PANTOJA would deliver it to defendant GUILLEN.

7          (52)   On September 20, 2006, using coded language,

8    Edgar Hernandez and defendant TERCERO discussed Edgar Hernandez's

9    delivery of rent money to defendant GUILLEN.

10          (53)   On September 25, 2006, using coded language,

11    defendants PANTOJA and MELGAREJO discussed ongoing CLCS

12    Organization criminal activity within the prison where MELGAREJO

13    was then incarcerated.

14          (54)   On September 26, 2006, using coded language,

15    defendant PANTOJA and Edgar Hernandez discussed Edgar Hernandez's

16    delivery of rent to defendant GUILLEN.

17          (55)   On September 26, 2006, using coded language,

18    defendant TERCERO and Edgar Hernandez discussed defendant

19    PANTOJA's delivery of rent to defendant GUILLEN.

20          (56)   On October 4, 2006, using coded language, Edgar

21    Hernandez and defendant PANTOJA discussed Edgar Hernandez's

22    attempt to deliver rent to defendant GUILLEN.

23          (57)   On October 5, 2006, using coded language, Edgar

24    Hernandez and defendant PANTOJA discussed delivering rent to

25    defendant GUILLEN.

26          (58)   On October 5, 2006, using coded language, Edgar

27    Hernandez and defendant TERCERO discussed delivering rent to

28    defendant GUILLEN.

(59)   On October 9, 2006, using coded language, defendants PANTOJA and RUIZ discussed the recent arrests on federal charges of numerous members of other cliques of the 18th Street Gang.

(60)   On October 10, 2006, using coded language, defendants PANTOJA and AREVALO discussed with Edgar Hernandez Edgar Hernandez delivering rent to PANTOJA with the assistance of AREVALO.

(61)   On October 10, 2006, using coded language, defendants TERCERO and AREVALO discussed the payment of rent by Edgar Hernandez and others.

(62)   On October 10, 2006, using coded language, defendants PANTOJA and TERCERO discussed efforts to collect rent from Jose Luis Miranda ("Miranda"), a wholesale distributor of crack cocaine who operated in CLCS Organization territory.

(63)   On October 17, 2006, defendant AREVALO arranged a meeting between defendant TERCERO and Miranda at defendant PANTOJA's tattoo shop.

(64)   On October 24, 2006, Mexican Mafia Member 1 wrote a letter to defendant RUIZ that, using coded language, instructed RUIZ to contact defendant PANTOJA and that further advised RUIZ that 18th Street Gang members should communicate better with each other so there are no misunderstandings about gang business.

(65)   On November 1, 2006, using coded language, defendants PANTOJA and GUILLEN discussed PANTOJA delivering rent to GUILLEN the next day, at the same place where they had met for that purpose in the past.

(66)   On November 2, 2006, defendant PANTOJA delivered

rent to defendant GUILLEN at GUILLEN's law office.

(67)   On November 8, 2006, defendant AREVALO arranged a meeting between defendants PANTOJA and SALDANA at defendant PANTOJA's tattoo shop.

(68)   On November 11, 2006, using coded language, defendants PANTOJA and TERCERO discussed the collection of rent.

(69)   On November 13, 2006, using coded language, defendant RIVERA warned defendant TERCERO about the presence of police in CLCS Organization territory.

(70)   On November 13, 2006, using coded language, defendants PANTOJA and TERCERO discussed a money order that they previously sent to a Mexican Mafia member incarcerated at ADX-Florence and specifically whether PANTOJA should try to re-send the money order, which had been returned.

(71)   On November 16, 2006, using coded language, defendants TERCERO and AREVALO discussed packaging narcotics for sale.

(72) On November 20, 2006, using coded language, defendants TERCERO and SALDANA discussed the presence of police in CLCS Organization territory, and that the street narcotics dealers had left the area, but were returning.

(73)   On November 21, 2006, using coded language, defendant TERCERO and Miranda arranged to meet so that Miranda could deliver rent to TERCERO.

(74)   On November 22, 2006, using coded language, defendant PANTOJA wrote a letter to Mexican Mafia Member 1 saying that he would like to talk to one of his fellow gang members or Mexican Mafia brothers about his problems, and that PANTOJA would

30

1    stay focused in his efforts to become a Mexican Mafia member.

2           (75)   On November 29, 2006, using coded language,

3    defendants TERCERO and SALDANA discussed that the rent payments

4    from the street narcotics dealers should be ready for pick up by

5    5:00 p.m.

6           (76)   On November 29, 2006, Mexican Mafia Member 1

7    wrote a letter to defendant PANTOJA and, using coded language,

8    instructed him to stay focused in order to achieve his goal of

9    becoming a Mexican Mafia brother.

10           (77)   On November 29, 2006, using coded language,

11    defendant TERCERO told defendant SALDANA to pick up rent from

12    street dealers on the day shift, not the night shift.

13           (78)   On November 29, 2006, using coded language,

14    defendant TERCERO told defendant SALDANA that she was waiting for

15    Edgar Hernandez, but that "Crash" (referring to a Los Angeles

16    Police Department unit) was in the vicinity of CLCS Organization

17    territory.

18           (79)   On December 1, 2006, using coded language,

19    defendant PANTOJA identified himself as the "boss" of narcotics

20    street dealer Juan Velasquez, aka "La Viuda" ("J. Velasquez"),

21    discussed with J. Velasquez his purchase of crack cocaine from a

22    wholesale supplier in CLCS Organization territory who charged

23    less than another supplier who had been approved by PANTOJA, and

24    instructed J. Velasquez that he could continue this practice if

25    he also regularly purchased crack cocaine from PANTOJA's

26    designated supplier.

27           (80)   On December 2, 2006, using coded language,

28    defendant TERCERO directed narcotics wholesaler Miranda to

deliver rent early to defendant PANTOJA, and to have Fonseca also deliver rent early, because when PANTOJA is upset "he strikes to kill."

(81)  On December 3, 2006, using coded language, defendant SALDANA told defendant TERCERO that narcotics street dealer Edi Pineda Rivas, aka "Javier Garcia," aka "El Zarco" ("Rivas"), was in J. Velasquez' narcotics sales area within CLCS Organization territory and had a lot of crack cocaine for sale and SALDANA added that, after Rivas falsely claimed that the crack cocaine belonged to J. Velasquez, SALDANA "smacked" Rivas for selling crack cocaine in J. Velasquez' area without "authorization" from the CLCS Organization and then took Rivas' crack cocaine and cell phone.

(82)  On December 3, 2006, using coded language, defendant TERCERO and J. Velasquez discussed defendant SALDANA's assault on Rivas after Rivas was caught selling crack cocaine without authorization in J. Velasquez's "area," that defendant PANTOJA was "making his rounds" in CLCS Organization territory, and that the narcotics street dealers should realize that PANTOJA watches them.

(83)  On December 3, 2006, using coded language, defendant PANTOJA told defendant RIVERA that PANTOJA had Rivas assaulted for selling crack cocaine in J. Velasquez' area without "authorization" and that RIVERA should look out to see if Rivas was still dealing in CLCS Organization territory.

(84)  On December 3, 2006, using coded language, defendant SALDANA told defendant TERCERO that if he saw Rivas selling crack cocaine in CLCS Organization territory that Rivas

32

1  would "get it worse than" the last time, for which TERCERO

2  thanked SALDANA.

3         (85)   On December 4, 2006, using coded language,

4  defendant SALDANA warned defendant TERCERO that the police were

5  in CLCS Organization territory.

6         (86)   On December 5, 2006, using coded language,

7  defendant TERCERO and defendant SALDANA discussed that Rivas was

8  allowed to sell crack cocaine in CLCS Organization territory

9  again, and TERCERO directed SALDANA to give Rivas back his cell

10  phone but not his crack cocaine.

11         (87)   On December 7, 2006, using coded language,

12  defendant AREVALO told defendant TERCERO that the police had just

13  released him and that the police had searched Miranda's home and

14  found Miranda's crack cocaine.

15         (88)   On December 9, 2006, using coded language,

16  defendant PANTOJA directed defendant SALDANA to hide rent he was

17  carrying while on the street in the bra of a female companion.

18         (89)   On December 9, 2006, using coded language,

19  defendants TERCERO and SALDANA discussed how CLCS Organization

20  associate Christian Gavarette ("Gavarette") would begin providing

21  crack cocaine to street dealers because Miranda had been

22  arrested, and that Gavarette needed a place to store the crack

23  cocaine.

24         (90)   On December 9, 2006, using coded language,

25  defendant PANTOJA told defendant TERCERO that street dealers had

26  threatened to quit selling narcotics due to the quality of crack

27  cocaine provided to them, in response to which PANTOJA stated he

28  was considering assaults on the dealers, among other

33

1   repercussions.

2          (91)   On December 10, 2006, using coded language,

3   defendant TERCERO told defendant SALDANA that she was with the

4   "lady" (referring to narcotics wholesaler Lety Bertotty

5   Hernandez, aka "La Señora," aka "La Huera" ("Bertotty")) with the

6   crack cocaine and directed SALDANA to bring the money to pay for

7   the crack cocaine.

8          (92)   On December 10, 2006, using coded language,

9   defendant SALDANA told defendant TERCERO that he had collected

10  one-half of the rent owed by Edgar Hernandez and would collect

11  the other half that day.

12         (93)   On December 10, 2006, using coded language,

13  defendant TERCERO told defendant SALDANA that defendant PANTOJA

14  had beaten up two gang members who represented themselves to be

15  from "7th and Broadway" (referring to a particular 18th Street

16  Gang clique that had problems with the CLCS Organization) because

17  they had encroached upon CLCS Organization territory.

18         (94)   On December 11, 2006, using coded language,

19  defendant PANTOJA told defendant TERCERO that the narcotics

20  street dealers are going to need more crack cocaine, to which

21  TERCERO responded that she had ordered more crack cocaine from

22  narcotics wholesaler Jose Alberto Alvarenga Villeda, aka "Chepe,"

23  aka "El Gordo," aka "El Señor" ("Villeda"), and needed $1,000 to

24  pay Villeda for these drugs.

25         (95)   On December 12, 2006, using coded language,

26  defendant PANTOJA directed defendant SALDANA to collect rent from

27  street dealers working at night because they were behind in their

28  payments and because street dealers working in the day had not

34

1 | fully paid PANTOJA what he was owed.

2 |       (96)   On December 14, 2006, using coded language,

3 | defendant TERCERO told Villeda that she would introduce Gavarette

4 | to him so that Gavarette could begin picking up crack cocaine

5 | from Villeda; that defendant PANTOJA was not "going to be putting

6 | himself at risk anymore," and that, going forward, TERCERO would

7 | "only be in charge of . . . the money," which she would collect

8 | from Gavarette and then deliver to Villeda; and that Villeda

9 | would "only meet with" Gavarette to deliver crack cocaine to him.

10 |       (97)   On December 14, 2006, using coded language,

11 | defendant TERCERO told Gavarette that, based on the quantity of

12 | crack cocaine provided by Villeda, Gavarette should be able to

13 | make "fifteen or sixteen" packets of crack cocaine to distribute

14 | to street dealers and that there should be some additional crack

15 | cocaine left over, in response to which Gavarette stated that the

16 | "night crew usually calls" him when they get there and that the

17 | quality of the pieces of crack cocaine Gavarette had were "good,

18 | they almost look like chunkies."

19 |       (98)   On December 14, 2006, using coded language,

20 | Gavarette told defendant TERCERO that he was lacking enough

21 | "flats" (referring to a style of crack cocaine) "to make another

22 | bag" of them to give to a street dealer, and TERCERO responded

23 | that she would give him her "leftovers" to combine with his

24 | "leftovers."

25 |       (99)   On December 15, 2006, using coded language,

26 | defendant PANTOJA asked defendant TERCERO for a quantity of crack

27 | cocaine, to which TERCERO replied that Gavarette should have

28 | "sixteen" packets of crack cocaine, but that they were short "ten

1  or twenty" pieces for the sixteenth packet, and thus only had
2  fifteen complete packets, for which Gavarette owed them $1,500.

3           (100)  On December 15, 2006, using coded language,
4  defendant PANTOJA directed defendant TERCERO to "place the order"
5  and quickly have the crack cocaine delivered to Gavarette because
6  street dealers were "asking for some right now," in response to
7  which TERCERO stated that she would call Villeda, that Gavarette
8  and Villeda had "agreed on a place" to meet, and that the "money
9  is no problem" because TERCERO had told Villeda she would "give
10 it to him later."

11          (101)  On December 15, 2006, using coded language,
12 defendant TERCERO told Gavarette that he came up short on money,
13 and Gavarette informed TERCERO that two narcotics street dealers
14 came by yesterday and each bought two packages of cocaine base.

15          (102)  On December 15, 2006, using coded language,
16 Gavarette told defendant TERCERO that, the prior night, the
17 police had been watching Gavarette and some street dealers while
18 they were on the street in CLCS Organization territory selling
19 crack cocaine to customers, and TERCERO warned Gavarette that
20 they needed to be careful.

21          (103)  On December 16, 2006, defendant PANTOJA told a
22 narcotics street dealer that Gavarette would not sell him any
23 crack cocaine until the street dealer paid what he owed, and
24 PANTOJA then instructed Gavarette to follow this directive.

25          (104)  On December 17, 2006, using coded language,
26 defendants TERCERO and SALDANA discussed Gavarette's collection
27 of money for crack cocaine from street dealers.

28          (105)  On December 17, 2006, using coded language,

36

1  defendants TERCERO and RIVERA discussed the collection of rent

2  from street dealers.

3       (106)  On December 18, 2006, using coded language,

4  defendant RIVERA told defendant PANTOJA that he would deliver all

5  of the rent he owed, as well as the rent owed by another street

6  dealer.

7       (107)  On December 18, 2006, using coded language,

8  defendants PANTOJA and SALDANA discussed that street dealers were

9  not selling crack cocaine because of the amount of rent they had

10 to pay and that, in order to address customer demand, SALDANA

11 should have Gavarette and Edgar Hernandez sell narcotics on the

12 street.

13      (108)  On December 19, 2006, using coded language,

14 defendant PANTOJA and Edgar Hernandez discussed Edgar Hernandez'

15 collection of rent and his delivery of money to defendant

16 GUILLEN.

17      (109)  On December 23, 2006, using coded language,

18 defendant TERCERO asked Gavarette if he still had crack cocaine,

19 to which Gavarette replied that he only had "two of the chunky

20 kind and flat too" (referring to styles of crack cocaine), and

21 that he had given defendant SALDANA $300 in rent and $300 for

22 crack cocaine.

23      (110)  On December 23, 2006, using coded language,

24 Gavarette told defendant TERCERO that he was owed $600 from

25 street dealers, that none of them had paid that day, and that

26 defendant SALDANA told him what to do if they failed to pay.

27      (111)  On December 23, 2006, defendant TERCERO told

28 Gavarette that she was going to order the "chunky kind"

(referring to a style of crack cocaine) from Villeda for delivery
to Gavarette.

(112)  On December 25, 2006, using coded language,
defendant TERCERO told defendant SALDANA to collect money from
Gavarette because she did not want Gavarette "to have all that
money on him," and that Gavarette had told her he had the "ten"
($1,000) that he owed, to which SALDANA replied that he would
pick up the money from Gavarette.

(113)  On December 25, 2006, using coded language,
defendant PANTOJA told defendant SALDANA to tell Edgar Hernandez
to deliver rent to PANTOJA.

(114)  On December 28, 2006, using coded language,
defendant TERCERO complained to Villeda that the crack cocaine
Villeda was "sending is no good" because it was "too thin" and
"falls apart," to which Villeda responded that no street dealers
had previously complained to him.

(115)  On December 28, 2006, using coded language,
Villeda told defendant TERCERO that, at times, Villeda had
provided crack cocaine directly to street dealers, but that
Villeda knew "what the rules are" and did not want to violate
CLCS Organization rules by not deferring to PANTOJA's control of
dealings between the narcotics wholesalers and street dealers in
CLCS Organization territory.

(116)  On December 28, 2006, using coded language,
defendant PANTOJA instructed Gavarette that Gavarette needed to
be readily available to provide crack cocaine to street dealers.

(117)  On December 29, 2006, using coded language,
defendants TERCERO and SALDANA discussed with Gavarette the

38

1 quantities and styles -- including "chunky," "skinny," and "flat"

2 -- of crack cocaine being provided to street dealers, and the

3 money owed by these street dealers.

4 (118) On or about December 30, 2006, using coded

5 language, defendant PANTOJA directed defendant SALDANA to talk to

6 Gavarette about problems with how Gavarette had been handling

7 money and crack cocaine.

8 (119) On December 30, 2006, using coded language,

9 defendant PANTOJA told defendant SALDANA to remind Edgar

10 Hernandez about rent that was missing from the previous week.

11 (120) On December 30, 2006, using coded language,

12 Gavarette and defendant PANTOJA discussed why Gavarette was

13 coming up short on sales of narcotics, and Gavarette told PANTOJA

14 that he suspected that "Chava" was stealing the narcotics.

15 (121) On December 30, 2006, defendant PANTOJA told

16 Gavarette to straighten out the situation regarding the narcotics

17 that were not accounted for, because if PANTOJA had to handle it

18 "there is going to be some shit."

19 (122) On December 30, 2006, using coded language,

20 defendant PANTOJA told defendant SALDANA to find "Chava" and

21 assault him and then to go hit Gavarette for being a "dumbass"

22 for letting "Chava" steal narcotics.

23 (123) On December 31, 2006, using coded language,

24 defendant SALDANA told defendant PANTOJA that he had $500 to give

25 to PANTOJA, after which PANTOJA chastised SALDANA for calling him

26 "on the wrong phone" and told SALDANA that he "just might as well

27 go turn me in" to the police.

28 (124) On January 2, 2007, using coded language,

39

1   defendant SALDANA told defendant TERCERO that Villeda had

2   delivered "seven and one-half of the fatty ones" (referring to a

3   quantity and style of crack cocaine) to Gavarette and discussed

4   with TERCERO rent collected from street dealers and money

5   collected by Gavarette to pay for crack cocaine.

6              (125)   On January 2, 2007, using coded language,

7   Gavarette told defendant TERCERO that he had set "those two"

8   (referring to packages of cocaine base) aside for two street

9   dealers.

10             (126)   On January 3, 2007, using coded language,

11  defendant PANTOJA asked defendant SALDANA to call Edgar Hernandez

12  to make sure Edgar Hernandez met PANTOJA at 7:00 p.m.

13             (127)   On January 3, 2007, using coded language,

14  defendants PANTOJA and SALDANA discussed Edgar Hernandez getting

15  pulled over by the police, and SALDANA informed PANTOJA that

16  Edgar Hernandez had already delivered the rent he possessed to

17  defendant GUILLEN before he was stopped by police.

18             (128)   On January 3, 2007, using coded language,

19  defendants PANTOJA and SALDANA agreed to meet with Edgar

20  Hernandez to discuss what happened when he was stopped by the

21  police.

22             (129)   On January 4, 2007, using coded language,

23  defendant TERCERO asked Gavarette how many "chunkies" he had left

24  and then told him to take his share of $250 out of the $1,000 in

25  his possession and give the remaining $750 to defendant SALDANA

26  to deliver to TERCERO.

27             (130)   On January 5, 2007, using coded language,

28  defendants PANTOJA, TERCERO, and SALDANA discussed that Gavarette

40

1  needed more of the "thin kind" of crack cocaine and that SALDANA
2  had picked up $750 from Gavarette that was owed to TERCERO.

3      (131)  On January 5, 2007, using coded language,
4  defendants PANTOJA and SALDANA discussed putting a new street
5  dealer in CLCS Organization territory, the style of crack cocaine
6  the new dealer would sell, and that the new dealer would start by
7  paying $100 in rent.

8      (132)  On January 10, 2007, using coded language,
9  defendant PANTOJA told defendant TERCERO that the police stopped
10 defendant SALDANA and took his "check," which PANTOJA explained
11 consisted of $500 in ten- and twenty-dollar bills.

12     (133)  On January 10, 2007, defendant PANTOJA told
13 defendant TERCERO that Edgar Hernandez was not welcome in the
14 neighborhood anymore and that, if he came back, the "homies"
15 would give him a beating.

16     (134)  On January 10, 2007, defendant PANTOJA told
17 defendant TERCERO that he was going to let the "traqs" buy from
18 whoever they want.

19     (135)  On February 6, 2007, defendant PANTOJA possessed
20 approximately 5.76 grams of crack cocaine and approximately
21 $10,000 in United States currency.

22     (136)  In or about September 2007, defendant PANTOJA
23 demanded a rent payment from street vendor F.C. and then issued a
24 verbal threat to F.C., who refused to make payment.

25     (137)  On September 15, 2007, defendants PANTOJA,
26 MURILLO, D. GONZALEZ, Y. VELASQUEZ, MEJIA, J. GONZALEZ, ALAS, and
27 RANGEL, and unindicted co-conspirator #1 ("CC-1") agreed to
28 assault F.C.

41

1          (138)   On September 15, 2007, CC-1 attempted to murder

2     F.C. by shooting him, resulting in permanent bodily injury to

3     F.C.

4          (139)   On September 15, 2007, CC-1, in attempting to

5     murder F.C., killed L.A.G, a twenty-three day old child.

6          (140)   On September 15, 2007, defendants PANTOJA,

7     MURILLO, D. GONZALEZ, Y. VELASQUEZ, MEJIA, J. GONZALEZ, ALAS, and

8     RANGEL aided and abetted the killing of L.A.G.

9          (141)   On September 16, 2007, in CLCS Organization

10    territory, defendant ESTRADA threatened J.M., a witness to the

11    murder of L.A.G. and attempted murder of F.C., and told J.M. that

12    if J.M. told the police what J.M. had seen regarding the murder

13    and attempted murder, ESTRADA would "come get [J.M.] and [J.M.'s]

14    family."

15          (142)   On September 17, 2007, defendants ESTRADA and

16    BRIZUELA threatened J.M., a witness to the murder of L.A.G. and

17    attempted murder of F.C., by dragging J.M. into an alley and

18    telling J.M. that if J.M. told the police what J.M. had seen

19    regarding the murder and attempted murder, J.M. would "get

20    [J.M.'s] ass whooped" by ESTRADA and BRIZUELA, and that J.M.

21    would be "jumped by the homies" (assaulted by CLCS Organization

22    members and associates).

23          (143)   On September 19, 2007, defendants PANTOJA and

24    MURILLO agreed that CC-1 would be taken to Mexico under the false

25    pretense of hiding him from the police officers who were

26    investigating the  murder of L.A.G., so that MURILLO could kill

27    CC-1 and remove the "green light" that the Mexican Mafia had

28    placed on the 18th Street Gang because CC-1 killed L.A.G.

1        (144)   On September 19, 2007, through September 21,

2   2007, defendants MURILLO and PEREZ kidnaped CC-1, taking him from

3   Los Angeles to Mexico, under the false pretense of hiding him

4   from the police, while their true intent was to murder CC-1 at

5   the direction of defendant PANTOJA, in order to remove the "green

6   light" placed on the 18th Street Gang by the Mexican Mafia

7   because CC-1 had killed L.A.G.

8        (145)   On September 21, 2007, defendants MURILLO and

9   PEREZ attempted to murder CC-1 by strangling him until he was

10  unconscious and leaving him for dead on the side of a road,

11  resulting in serious bodily injury to CC-1.

12       (146)   On October 16, 2007, using coded language,

13  defendant MURILLO told unindicted co-conspirator #2 ("CC-2") that

14  defendant PANTOJA would allow the sales of crack cocaine they

15  were discussing and that they needed to start selling quickly

16  before the "clients" went somewhere else.

17       (147)   On October 16, 2007, CC-2, using coded language,

18  CC-2 told defendant MURILLO that he and "Marcos" were

19  distributing narcotics at a location in CLCS Organization

20  territory.

21       (148)   On October 16, 2007, using coded language,

22  defendant MURILLO told CC-2 that CC-2 and "Marcos" were going to

23  be the narcotics suppliers at the location identified by CC-2.

24       (149)   On October 16, 2007, using coded language,

25  defendant MURILLO and CC-2 discussed collecting rent payments

26  from the narcotics dealers at a rate of $400 per week.

27       (150)   On October 16, 2007, using coded language,

28  defendants MURILLO and ATUNEES discussed the collection of rent

43

from street vendors operating in CLCS Organization territory, and compiling a list of the vendors who owed rent.

(151)   On October 16, 2007, defendant ATUNEES called defendant MURILLO and put a vendor on the phone who owed MURILLO fifty dollars ($50) in rent, at which time MURILLO told the vendor that he could pay the $50 to ATUNEES the following week.

(152)   On October 17, 2007, using coded language, CC-2 told defendant MURILLO that there was a "miquero" (fraudulent identification/immigration document dealer) called "Colo" who was going to pay the rent he owed, and CC-2, in turn, would give the money to MURILLO.

(153)   On October 17, 2007, using coded language, CC-2 and MURILLO discussed assaulting a narcotics street dealer who was selling narcotics at 4th Street and Burlington Avenue, within CLCS Organization territory, with MURILLO telling CC-2 that they would have the "little homies go dump on those niggas" at that location.

(154)   On October 17, 2007, using coded language, defendant MURILLO and CC-2 discussed selling narcotics at 4th Street and Burlington Avenue within CLCS Organization territory, with MURILLO telling CC-2 that he wanted to put "two from Columbia" at that location.

(155)   On October 17, 2007, using coded language, defendant MURILLO and CC-2 discussed collecting rent from defendant Y. VELASQUEZ and his brothers because "ain't nobody doing no dope slanging for free, dog."

(156)   On October 17, 2007, using coded language, defendant MURILLO told CC-2 that defendant Y. VELASQUEZ had asked

44

1  for "a seven" (referring to an amount of narcotics).

2          (157)  On October 17, 2007, using coded language,
3  defendant MURILLO and CC-2 discussed the Rockwood Gang's tagging
4  in CLCS Organization territory and the need to get guns.

5          (158)  On October 17, 2007, using coded language,
6  defendant MURILLO instructed CC-2 to ask the "homies" to get some
7  9mm Beretta bullets.

8          (159)  On October 19, 2007, using coded language,
9  defendants MURILLO and ATUNEES discussed collecting rent from
10  people who play card games in the park.

11          (160)  On October 19, 2007, using coded language,
12  defendant MURILLO and CC-2 discussed producing and selling false
13  documents, with MURILLO telling CC-2 that he would inform
14  defendant PANTOJA about their plans.

15          (161)  On October 21, 2007, using coded language,
16  defendant MURILLO told defendant BRIZUELA that there was a black
17  car on Burlington Avenue that he thought was a cop.

18          (162)  On October 21, 2007, using coded language,
19  defendant MURILLO told defendant BRIZUELA if she saw the car she
20  suspected was a cop, she should take a "homeboy" and "light that
21  motherfucker up" (shoot at the car), to which BRIZUELA replied,
22  "All right."

23          (163)  On October 21, 2007, using coded language,
24  defendant MURILLO told an 18th Street Gang member that the
25  occupants of the black car that he had previously discussed with
26  defendant BRIZUELA were "MS" (from the rival "MS-13" street
27  gang), and MURILLO instructed CC-2 to sneak up on the car, make
28  sure there were no "youngsters" in it, and shoot the occupants in

1   the car.

2           (164)   On October 21, 2007, using coded language,

3   defendants MURILLO and ATUNEES discussed assaulting someone who

4   was collecting rent from the card players in the park and who was

5   not authorized to do so by the CLCS Organization.

6           (165)   On October 21, 2007, using coded language,

7   defendants MURILLO and ATUNEES agreed that ATUNEES would make a

8   list of all the vendors who were paying rent because MURILLO said

9   there were "a lot of people . . . selling DVDs that haven't

10  paid."

11          (166)   On October 21, 2007, using coded language,

12  defendant MURILLO told defendant ATUNEES that he already picked

13  up the rent, but that MURILLO still wanted the list of all the

14  vendors who were supposed to pay rent to the CLCS Organization.

15          (167)   On October 22, 2007, using coded language,

16  defendant MURILLO told defendant ATUNEES to get "all the money

17  today from the 'miqueros'" (fraudulent document dealers)."

18          (168)   On October 22, 2007, using coded language,

19  defendant ATUNEES told defendant MURILLO that he had collected

20  $110 from the miqueros.

21          (169)   On October 22, 2007, using coded language,

22  defendant MURILLO told "Rosie" Last Name Unknown ("LNU") that he

23  had "the keys for Columbia" (that he was the current shot caller

24  for the CLCS Organization).

25          (170)   On October 23, 2007, using coded language,

26  defendant ATUNEES told defendant MURILLO that a vendor did not

27  currently have the rent he owed to the CLCS Organization, to

28  which MURILLO replied, "tell him when I get there I want the

46

fuckin' money."

    (171)   On October 23, 2007, using coded language,
defendant ATUNEES told defendant MURILLO that ATUNEES had advised
the vendor who owed the CLCS Organization rent but who had not
yet paid that if the vendor did not pay the rent, ATUNEES would
not be responsible for what "they can do to you."

    (172)   On October 23, 2007, using coded language,
defendant ESTRADA called defendant MURILLO and told MURILLO,
"Whatever you tell me to do, that's what I'm gonna do, homie.
You know already."

    (173)   On October 23, 2007, using coded language,
defendants MURILLO and ATUNEES discussed how much rent they
should charge "Conejo," and ATUNEES told MURILLO that "Conejo"
still owed one week's rent, plus a $30 fine that ATUNEES had
placed on him.

    (174)   On October 23, 2007, using coded language,
defendant MURILLO told defendant ATUNEES to collect this week's
rent and the money that "Conejo" owed ATUNEES, and that "Conejo"
could not come back to work in CLCS Organization territory unless
he paid this money.

    (175)   On October 23, 2007, using coded language, CC-2
called defendant ATUNEES and asked ATUNEES if he had all of the
rent ATUNEES was responsible for collecting on behalf of the CLCS
Organization.

    (176)   On October 23, 2007, using coded language,
defendant ATUNEES told CC-2 that he did not have all of the rent
due to the CLCS Organization because four individuals the CLCS
Organization was taxing had not paid.

47

1          (177)  On October 23, 2007, using coded language,
2    defendant MURILLO and CC-2, using coded language, talked about
3    fining people who had not timely paid rent demanded by the CLCS
4    Organization.

5          (178)  On October 23, 2007, using coded language,
6    defendant ATUNEES told defendant MURILLO that a street vendor had
7    only paid $45 in rent, and that ATUNEES had told the street
8    vendor that the rent owed was $75.

9          (179)  On October 23, 2007, using coded language,
10   defendant MURILLO told defendant ATUNEES to collect the rest of
11   the money from the vendor, or else MURILLO did not want to see
12   the vendor in CLCS Organization territory anymore.

13         (180)  On October 23, 2007, using coded language,
14   defendant ESTRADA called defendant MURILLO and asked if MURILLO
15   needed him for anything (to sell drugs or commit other criminal
16   activity), explaining that he was broke.

17         (181)  On October 23, 2007, using coded language,
18   defendant MURILLO told defendant ESTRADA that a few of his street
19   dealers had been arrested and that ESTRADA could still sell drugs
20   if he wanted to do so.

21         (182)  On the following dates, defendant GUILLEN
22   transferred the following approximate amounts in CLCS
23   Organization rent proceeds into the federal Bureau of Prisons
24   commissary account of unindicted coconspirator Mexican Mafia
25   Member 1:

26                    DATE        AMOUNT
27         (183)  10/16/2003    $1,000
28         (184)  11/19/2003    $ 500

48

| | | | | |
|---|---|---|---|---|
| 1 | (185) | 12/08/2003 | $ | 500 |
| 2 | (186) | 01/21/2004 | $ | 500 |
| 3 | (187) | 02/10/2004 | $ | 500 |
| 4 | (188) | 03/09/2004 | $ | 500 |
| 5 | (189) | 04/21/2004 | $ | 500 |
| 6 | (190) | 05/12/2004 | $ | 500 |
| 7 | (191) | 06/14/2004 | $ | 500 |
| 8 | (192) | 07/27/2004 | $ | 500 |
| 9 | (193) | 08/18/2004 | $ | 500 |
| 10 | (194) | 09/15/2004 | $ | 500 |
| 11 | (195) | 11/02/2004 | $ | 500 |
| 12 | (196) | 12/10/2004 | $ | 500 |
| 13 | (197) | 02/07/2005 | $ | 500 |
| 14 | (198) | 03/08/2005 | $ | 500 |
| 15 | (199) | 04/05/2005 | $ | 500 |
| 16 | (200) | 05/06/2005 | $ | 500 |
| 17 | (201) | 06/10/2005 | $ | 500 |
| 18 | (202) | 07/19/2005 | $ | 500 |
| 19 | (203) | 08/02/2005 | $ | 500 |
| 20 | (204) | 09/08/2005 | $ | 500 |
| 21 | (205) | 10/08/2005 | $ | 500 |
| 22 | (206) | 11/14/2005 | $ | 500 |
| 23 | (207) | 02/02/2006 | $ | 500 |
| 24 | (208) | 04/07/2006 | $ | 500 |
| 25 | (209) | 05/09/2006 | $ | 500 |
| 26 | (210) | 05/15/2006 | $ | 500 |
| 27 | (211) | 06/20/2006 | $ | 500 |
| 28 | (212) | 07/22/2006 | $ | 500 |

| | | | | |
|---|---|---|---|---|
| 1 | (213) | 08/14/2006 | $ | 500 |
| 2 | (214) | 09/18/2006 | $ | 500 |
| 3 | (215) | 10/18/2006 | $ | 500 |
| 4 | (216) | 11/21/2006 | $ | 500 |
| 5 | (217) | 12/17/2006 | $ | 500 |
| 6 | (218) | 01/15/2007 | $ | 500 |
| 7 | (219) | 02/25/2007 | $ | 500 |
| 8 | (220) | 03/31/2007 | $ | 500 |
| 9 | (221) | 04/08/2007 | $ | 500 |
| 10 | (222) | 05/17/2007 | $ | 500 |
| 11 | (223) | 06/29/2007 | $ | 500 |
| 12 | (224) | 07/29/2007 | $ | 500 |
| 13 | (225) | 09/03/2007 | $ | 500 |
| 14 | (226) | 11/03/2007 | $ | 500 |
| 15 | (227) | 12/02/2007 | $ | 500 |
| 16 | (228) | 01/04/2008 | $ | 500 |
| 17 | (229) | 02/05/2008 | $ | 500 |
| 18 | (230) | 03/11/2008 | $ | 500 |
| 19 | (231) | 04/14/2008 | $ | 500 |
| 20 | (232) | 04/28/2008 | $ | 500 |
| 21 | (233) | 06/06/2008 | $ | 500 |
| 22 | (234) | 06/30/2008 | $ | 500 |
| 23 | (235) | 07/29/2008 | $ | 500 |
| 24 | (236) | 09/17/2008 | $ | 500 |
| 25 | | | | |
| 26 | | | | |
| 27 | | | | |
| 28 | | | | |

1          NOTICE OF SPECIAL FINDINGS

2    Special Finding One (Narcotics Conspiracy)

3          Beginning on a date unknown to the Grand Jury, and

4    continuing until in or about October 2007, in Los Angeles

5    County, within the Central District of California, and

6    elsewhere, defendants PANTOJA, TERCERO, SALDANA, MURILLO, D.

7    RODRIGUEZ, MATEO, GUERRA, AREVALO, and RIVERA knowingly and

8    willfully conspired and agreed with each other to possess with

9    intent to distribute and to distribute at least fifty (50) grams

10   of a mixture or substance containing a detectable amount of

11   cocaine base in the form of crack cocaine, a schedule II

12   narcotic drug controlled substance, in violation of Title 21,

13   United States Code, Sections 841(a)(1) and (b)(1)(A)(iii).

14   Special Finding Two (Murder of J.B.)

15         On or about July 21, 2001, in Los Angeles County, within

16   the Central District of California, defendants EDUARDO

17   HERNANDEZ, L. IRAHETA, and V. IRAHETA willfully, deliberately,

18   and with premeditation, unlawfully killed J.B. with malice

19   aforethought, in violation of California Penal Code Sections 31,

20   187, 189 and 190.

21   Special Finding Three (Narcotics Distribution)

22         On or about May 2, 2006, in Los Angeles County, within the

23   Central District of California, defendant TERCERO, aided,

24   abetted, counseled, commanded, induced, and procured by

25   defendant PANTOJA, knowingly and intentionally distributed at

26   least 50 grams, that is, approximately 68.7 grams, of a mixture

27   or substance containing a detectable amount of cocaine base in

28   the form of crack cocaine, a schedule II narcotic drug

                              51

1    controlled substance, in violation of Title 21, United States

2    Code, Sections 841(a)(1), (b)(1)(A)(iii).

3    Special Finding Four (Felony Murder of L.A.G.)

4          On or about September 15, 2007, in Los Angeles County,

5    within the Central District of California, CC-1, in attempting

6    to unlawfully, willfully, deliberately, and with premeditation,

7    kill F.C. with malice aforethought, did commit the felony murder

8    of L.A.G., in violation of California Penal Code Sections 31,

9    187, 189, 190 and 664.

10          At the above time and place, defendants PANTOJA, MURILLO,

11   D. GONZALEZ, Y. VELASQUEZ, MEJIA, J. GONZALEZ, ALAS, and RANGEL

12   aided, abetted, counseled, commanded, induced, and procured the

13   commission of this offense.

14   Special Finding Five (Conspiracy to Murder G.M.)

15          Beginning no later than September 15, 2007, and continuing

16   through on or about September 21, 2007, in Los Angeles County,

17   within the Central District of California, and elsewhere,

18   defendants PANTOJA, MURILLO, and PEREZ conspired to commit the

19   unlawful, willful, deliberate, and premeditated murder of G.M.,

20   in violation of California Penal Code Sections 21a, 31, 182,

21   187, 189, and 190.

22   Special Finding Six (Attempted Murder of G.M.)

23          On or about September 21, 2007, in Los Angeles County,

24   within the Central District of California, and elsewhere,

25   defendants MURILLO and PEREZ, aided, abetted, counseled,

26   commanded, induced, and procured by defendant PANTOJA,

27   //

28   //

52

willfully, deliberately, and with premeditation, unlawfully
attempted to kill with malice aforethought G.M., in violation of
California Penal Code Sections 21a, 187, 189, and 664.

COUNT TWO

[21 U.S.C. § 846]

1.   Paragraphs 1 through 11, 14, 15, 17, 18, 20, 21, 23 and
25 of the Introductory Allegations of this Indictment and Overt
Acts 5, 8-10, 12-15, 19, 25-31, 34-36, 39-40, 42-44, 46-47, 60-
63, 67-73, 75, 77-92, 94-125, 129-35, 146-49, 153-56, and 181
are realleged and incorporated by reference as though fully set
forth herein.

A.   OBJECTS OF THE CONSPIRACY

2.   Beginning on a date unknown to the Grand Jury and
continuing until in or about October 2007, in Los Angeles
County, within the Central District of California, and
elsewhere, defendants PANTOJA, TERCERO, SALDANA, MURILLO, D.
RODRIGUEZ, MATEO, GUERRA, Y. VELASQUEZ, AREVALO, RIVERA, JOSE
ALBERTO ALVARENGA VILLEDA, aka "Chepe," aka "El Gordo," aka "El
Señor" ("VILLEDA"), LETY BERTOTTY HERNANDEZ, aka "La Señora,"
aka "La Huera" ("BERTOTTY"), ROXANA DELACRUZ RODRIGUEZ, aka
"Rox," APOLONIA RAMIREZ, aka "Reina" ("RAMIREZ"), MARCO ANTONIO
CAPETILLO, aka "Chupon" ("CAPETILLO"), MARCO ANTHONY FONSECA,
aka "Junior," aka "Primo," aka "Catracho" ("FONSECA"), MARCOS
GONZALES, aka "Mudo" ("M. GONZALES"), ANTONIO DIAZ, aka "Anibal
Hernandez," aka "Toño" ("DIAZ"), EDI PINEDA RIVAS, aka "Javier
Garcia," aka "El Zarco" ("RIVAS"), JUAN VELASQUEZ, aka "La
Viuda" ("J. VELASQUEZ"), and First Name Unknown, Last Name
Unknown ("FNU LNU"), aka "El Buki" ("EL BUKI"), and others known
and unknown to the Grand Jury, knowingly and willfully conspired
and agreed with each other to possess with intent to distribute
and to distribute at least fifty (50) grams of a mixture or

54

1  substance containing a detectable amount of cocaine base in the

2  form of crack cocaine ("crack cocaine"), a schedule II narcotic

3  drug controlled substance, in violation of Title 21, United

4  States Code, Sections 841(a)(1) and (b)(1)(A)(iii).

5  B.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE

6       ACCOMPLISHED

7       The objects of the conspiracy were to be accomplished in

8  substance as follows:

9       1.   The CLCS Organization, acting at the direction of the

10  presiding CLCS Organization shot caller, would use violence and

11  intimidation to control narcotics trafficking in its territory.

12      2.   Defendants PANTOJA, TERCERO, SALDANA, MURILLO, GUERRA,

13  AREVALO, RIVERA, and R. RODRIGUEZ, and other members and

14  associates of the CLCS Organization, would recruit and organize

15  narcotics wholesale suppliers and street dealers to traffic in

16  narcotic controlled substances, primarily crack cocaine, in CLCS

17  Organization territory.

18      3.   Defendants PANTOJA, TERCERO, SALDANA, MURILLO, GUERRA,

19  AREVALO, RIVERA, and R. RODRIGUEZ, and other members and

20  associates of the CLCS Organization, would direct the wholesale

21  suppliers, including defendants VILLEDA and BERTOTTY, and street

22  dealers, including defendants RAMIREZ, CAPETILLO, FONSECA, M.

23  GONZALES, DIAZ, RIVAS, J. VELASQUEZ, and EL BUKI, to regularly

24  pay rent to the CLCS Organization in exchange for

25  "authorization" to sell narcotic controlled substances,

26  including crack cocaine, in CLCS Organization territory.

27      4.   Defendants PANTOJA, TERCERO, SALDANA, MURILLO, GUERRA,

28  AREVALO, RIVERA, and R. RODRIGUEZ, and other members and

associates of the CLCS Organization, would regularly collect and

assist with the collection of rent from narcotics street dealers

operating in CLCS Organization territory, including defendants

RAMIREZ, CAPETILLO, FONSECA, M. GONZALES, DIAZ, RIVAS, J.

VELASQUEZ, and EL BUKI.

5.   Defendants PANTOJA, TERCERO, SALDANA, MURILLO,

AREVALO, RIVERA, and R. RODRIGUEZ, and other members and

associates of the CLCS Organization, would direct street dealers

operating in CLCS Organization territory, including defendants

RAMIREZ, CAPETILLO, FONSECA, M. GONZALES, DIAZ, RIVAS, J.

VELASQUEZ, and EL BUKI, regarding where and when in CLCS

Organization territory they could sell narcotic controlled

substances, the wholesale suppliers from whom they were to

regularly purchase narcotic controlled substances, and the

quantity and price of narcotic controlled substances they were

expected to purchase regularly from wholesale suppliers.

6.   Defendants PANTOJA, TERCERO, SALDANA, AREVALO, RIVERA,

and R. RODRIGUEZ, and other members and associates of the CLCS

Organization, would regularly purchase narcotic controlled

substances, including crack cocaine, from wholesale suppliers,

including defendants VILLEDA and BERTOTTY, for distribution in

CLCS Organization territory.

7.   Defendants PANTOJA, TERCERO, SALDANA, AREVALO, RIVERA,

and R. RODRIGUEZ, and other members and associates of the CLCS

Organization, would regularly provide narcotic controlled

substances, including crack cocaine, that had been purchased

from wholesale suppliers to street dealers operating in CLCS

Organization territory, including defendants RAMIREZ, CAPETILLO,

56

FONSECA, M. GONZALES, DIAZ, RIVAS, J. VELASQUEZ, and EL BUKI,

for distribution to customers in CLCS Organization territory.

     8.  Defendants PANTOJA, TERCERO, SALDANA, MURILLO, AREVALO,

RIVERA, and R. RODRIGUEZ, and other members and associates of

the CLCS Organization, would regularly collect narcotics

proceeds from street dealers operating in CLCS Organization

territory, including defendants RAMIREZ, CAPETILLO, FONSECA, M.

GONZALES, DIAZ, RIVAS, J. VELASQUEZ, and EL BUKI, in order to

pay wholesale suppliers, including defendants VILLEDA and

BERTOTTY, for narcotic controlled substances, including crack

cocaine, which had been and would be provided to street dealers

for distribution in CLCS Organization territory.

     9.  Defendants PANTOJA, TERCERO, SALDANA, MURILLO, D.

RODRIGUEZ, MATEO, Y. VELASQUEZ, AREVALO, RIVERA, R. RODRIGUEZ,

VILLEDA, BERTOTTY, RAMIREZ, CAPETILLO, FONSECA, M. GONZALES,

DIAZ, RIVAS, J. VELASQUEZ, and EL BUKI, and other members and

associates of the CLCS Organization, would possess with intent

to distribute, distribute, and aid and abet the distribution of,

narcotic controlled substances, including crack cocaine, in CLCS

Organization territory.

     10.  Defendants PANTOJA, TERCERO, SALDANA, MURILLO,

AREVALO, RIVERA, and R. RODRIGUEZ, and other members and

associates of the CLCS Organization, would regularly monitor the

amount of narcotic controlled substances, including crack

cocaine, being sold by street dealers in CLCS Organization

territory to insure that the street dealers had an adequate

supply for sale to customers.

     11.  Defendants PANTOJA, TERCERO, SALDANA, MURILLO,

AREVALO, RIVERA, and R. RODRIGUEZ, and other members and
associates of the CLCS Organization, would act and/or give
direction to others to act as necessary in order to resolve
issues that would arise in the narcotics distribution operation.

12.  Defendants PANTOJA, TERCERO, SALDANA, MURILLO, D.
RODRIGUEZ, MATEO, Y. VELASQUEZ, AREVALO, RIVERA, R. RODRIGUEZ,
VILLEDA, BERTOTTY, RAMIREZ, CAPETILLO, FONSECA, M. GONZALES,
DIAZ, RIVAS, J. VELASQUEZ, and EL BUKI, and other members and
associates of the CLCS Organization, would regularly use the
telephone and face-to-face meetings in order to maintain
communication regarding narcotics distribution and rent
collection activities in CLCS Organization territory.

13.  In order to evade detection and maintain the narcotics
distribution operation, defendants PANTOJA, TERCERO, SALDANA,
MURILLO, D. RODRIGUEZ, MATEO, GUERRA, AREVALO, RIVERA, R.
RODRIGUEZ, Y. VELASQUEZ, VILLEDA, BERTOTTY, RAMIREZ, CAPETILLO,
FONSECA, M. GONZALES, DIAZ, RIVAS, J. VELASQUEZ, and EL BUKI,
and other members and associates of the CLCS Organization, would
regularly communicate in coded and/or guarded language, limit
their use of certain telephones, and warn co-conspirators about
the presence of law enforcement in CLCS Organization territory,
as well as of other threats to the narcotics trafficking
operation.

14.  In order to further evade detection and maintain the
narcotics distribution operation, defendants PANTOJA, TERCERO,
SALDANA, and AREVALO, and other members and associates of the
CLCS Organization, would regularly conduct narcotics trafficking
activities, including the distribution of narcotic controlled

1   substances and the collection of rent and money used to pay for

2   narcotic controlled substances, from within "Unico's Tattoo

3   Shop," a business operated by PANTOJA in CLCS Organization

4   territory ("defendant PANTOJA's tattoo shop").

5   C.   OVERT ACTS

6        1.   In furtherance of the conspiracy and to accomplish the

7   objects of the conspiracy, defendants PANTOJA, TERCERO, SALDANA,

8   MURILLO, D. RODRIGUEZ, MATEO, GUERRA, Y. VELASQUEZ, AREVALO,

9   RIVERA, R. RODRIGUEZ, VILLEDA, BERTOTTY, RAMIREZ, CAPETILLO,

10  FONSECA, M. GONZALES, DIAZ, RIVAS, J. VELASQUEZ, and EL BUKI,

11  and others known and unknown to the Grand Jury, committed

12  various overt acts, within the Central District of California

13  and elsewhere, on or about the dates set forth below:

14        (1)   On November 8, 2005, defendant RAMIREZ sold crack

15  cocaine in CLCS Organization territory.

16        (2)   On March 15, 2006, defendant VILLEDA possessed

17  approximately 110.8 grams of crack cocaine, which he sold to a

18  cooperating witness ("CW-1").

19        (3)   On April 11, 2006, in defendant PANTOJA's tattoo

20  shop, defendant PANTOJA offered to sell CW-2 "chunky" (referring

21  to a style of crack cocaine) at "sixty for a hundred" (sixty

22  pieces for $100) that CW-2 could then provide to street dealers

23  to sell to customers.

24        (4)   On April 27, 2006, defendant RAMIREZ sold four

25  grams of crack cocaine to CW-2.

26        (5)   On May 2, 2006, in CLCS Organization territory,

27  defendant TERCERO, acting at the direction of and in concert

28  with defendant PANTOJA, sold approximately 68.7 grams of crack

1    cocaine to CW-2.

2            (6)   On May 22, 2006, defendant VILLEDA possessed

3    approximately 58.7 grams of crack cocaine that he sold to a

4    federal agent acting in an undercover capacity ("UC-1").

5            (7)   On June 14, 2006, at her home in CLCS

6    Organization territory, defendant R. RODRIGUEZ possessed

7    approximately 44.04 grams of crack cocaine, approximately $1,293

8    in U.S. currency, and a drug ledger regarding rent collected

9    from street dealers in CLCS Organization territory.

10           (8)   On September 21, 2006, in CLCS Organization

11   territory, defendants CAPETILLO and FONSECA distributed crack

12   cocaine to customers in CLCS Organization territory in the

13   vicinity of 5th Street and Burlington Avenue.

14           (9)   On October 11, 2006, using coded language,

15   defendants AREVALO and EL BUKI arranged for EL BUKI to meet

16   defendant PANTOJA at defendant PANTOJA's tattoo shop.

17           (10) On October 13, 2006, using coded language,

18   defendant PANTOJA warned defendant TERCERO about coming to

19   defendant PANTOJA's tattoo shop because of police activity, and

20   TERCERO stated that she would not come.

21           (11) On October 19, 2006, using coded language,

22   defendant RIVERA told defendant TERCERO that he warned a street

23   dealer that defendant PANTOJA would "go after" the dealer if a

24   problem was not resolved.

25           (12) On October 21, 2006, defendant AREVALO told

26   defendant PANTOJA to call him back from another telephone.

27           (13) On October 21, 2006, using coded language,

28   defendant PANTOJA and an unidentified male briefly discussed the

                                    60

1  arrest of defendant FONSECA, and PANTOJA told the unidentified
2  male to come to defendant PANTOJA's tattoo shop because the
3  phone line at defendant PANTOJA's tattoo shop had been
4  wiretapped.

5       (14) On October 26, 2006, using coded language,
6  defendant AREVALO told defendant EL BUKI that defendant PANTOJA
7  would call him because PANTOJA could not talk on the phone line
8  at defendant PANTOJA's tattoo shop.

9       (15) On October 30, 2006, using coded language,
10 defendants TERCERO and R. RODRIGUEZ arranged to meet so that R.
11 RODRIGUEZ could deliver money.

12      (16) On November 4, 2006, using coded language,
13 defendants TERCERO and R. RODRIGUEZ discussed the collection of
14 rent from defendant FONSECA and Miranda.

15      (17) On November 4, 2006, using coded language,
16 defendant FONSECA arranged to deliver rent to defendants PANTOJA
17 and TERCERO via defendant R. RODRIGUEZ and indicated that he had
18 previously delivered money to the wrong person, in response to
19 which PANTOJA directed FONSECA to retrieve the money and deliver
20 it to R. RODRIGUEZ.

21      (18) On November 5, 2006, using coded language,
22 defendants TERCERO and R. RODRIGUEZ arranged to meet so that R.
23 RODRIGUEZ could deliver rent that she had collected from
24 defendant FONSECA.

25      (19) On November 8, 2006, using coded language,
26 defendant PANTOJA complained to defendant TERCERO that CW-2 was
27 using the term rent when "talking over the fucking phone" to
28 PANTOJA.

1          (20) On November 16, 2006, using coded language,

2   defendants TERCERO and AREVALO discussed the presence of police

3   near defendant PANTOJA's tattoo shop and that AREVALO should not

4   prepare the crack cocaine "light," but instead "loaded."

5          (21) On November 16, 2006, using coded language,

6   defendant TERCERO asked defendant RIVERA if he had any crack

7   cocaine for a customer because Miranda was unavailable.

8          (22) On November 19, 2006, using coded language,

9   defendant TERCERO and Miranda discussed that Miranda had

10  collected "four" ($400) from the narcotics street dealers, that

11  FONSECA was going to give $740 collected from street dealers to

12  Miranda, and that Miranda should deliver the money to defendant

13  R. RODRIGUEZ.

14         (23) On November 19, 2006, using coded language,

15  defendants TERCERO and VILLEDA discussed the delivery of crack

16  cocaine by defendant BERTOTTY to Miranda.

17         (24) On November 19, 2006, using coded language,

18  Miranda told defendant TERCERO that he had a firearm when he

19  went to meet defendant BERTOTTY, who was waiting for him with

20  crack cocaine.

21         (25) On November 19, 2006, using coded language,

22  defendants TERCERO and R. RODRIGUEZ discussed collecting rent

23  from street dealers, including defendants RIVAS, CAPETILLO,

24  FONSECA, M. GONZALES, DIAZ, and J. VELASQUEZ, and Miranda.

25         (26) On November 21, 2006, using coded language,

26  defendants TERCERO and J. VELASQUEZ discussed J. VELASQUEZ's

27  payment of $450 in rent to TERCERO via defendant R. RODRIGUEZ,

28  and that J. VELASQUEZ still owed $50 in rent.

1    (27) On November 21, 2006, using coded language,

2 Miranda told defendant TERCERO that he was stopped by the police

3 and had to discard his supply of crack cocaine as a result.

4    (28) On November 25, 2006, using coded language,

5 defendants TERCERO and VILLEDA discussed that Miranda was

6 falling behind in payments for crack cocaine, that VILLEDA was

7 owed "thirteen" ($1,300), and that VILLEDA had recently

8 delivered "five and three" (quantities of two styles of crack

9 cocaine) to Miranda.

10    (29) On November 26, 2006, using coded language,

11 defendants TERCERO and J. VELASQUEZ discussed the payment of

12 rent to TERCERO via defendant R. RODRIGUEZ, and that J.

13 VELASQUEZ owed an additional $100 in rent.

14    (30) On November 26, 2006, using coded language,

15 defendants TERCERO and VILLEDA discussed that Miranda owed

16 VILLEDA $2,700 for crack cocaine.

17    (31) On November 26, 2006, using coded language,

18 defendant PANTOJA scolded Miranda for failing to meet defendant

19 BERTOTTY to pick up crack cocaine.

20    (32) On November 26, 2006, using coded language,

21 defendants TERCERO and VILLEDA discussed money Miranda owed

22 VILLEDA, as well as VILLEDA's delivery of "skinny stuff" and

23 "fat ones" (referring to two styles of crack cocaine) to

24 Miranda.

25    (33) On November 27, 2006, using coded language,

26 defendant TERCERO discussed with defendants BERTOTTY and VILLEDA

27 the possibility that a taxi driver they used was a police

28 informant.

1       (34) On November 29, 2006, using coded language,

2  defendant TERCERO and Miranda discussed when defendant DIAZ, a

3  new street dealer, would begin paying rent.

4       (35) On November 29, 2006, using coded language,

5  defendant TERCERO told defendant SALDANA that defendant DIAZ had

6  to start paying rent.

7       (36) On November 29, 2006, using coded language,

8  defendant TERCERO told defendant EL BUKI he could pay rent the

9  next day instead of on the day that he was regularly required to

10  pay rent.

11       (37) On November 30, 2006, using coded language,

12  defendant BERTOTTY told defendant TERCERO that she had delivered

13  crack cocaine to Miranda and that Miranda owed "six" ($600).

14       (38) On December 1, 2006, using coded language,

15  defendant TERCERO directed Miranda to tell defendant FONSECA to

16  deliver money to defendant R. RODRIGUEZ's apartment.

17       (39) On December 3, 2006, using coded language,

18  defendant PANTOJA told Miranda that defendant FONSECA "owed"

19  money for "one day" that Miranda should collect.

20       (40) On December 5, 2006, using coded language,

21  defendant TERCERO told Miranda only to give defendant RIVAS back

22  his cell phone, but not the crack cocaine Miranda had taken from

23  Rivas.

24       (41) On December 6, 2006, using coded language,

25  defendant TERCERO told Miranda to collect rent from EL BUKI and

26  deliver it to defendant R. RODRIGUEZ and further discussed with

27  Miranda the collection of rent from Edgar Hernandez, who owed

28  "one and a half" ($150).

1    (42) On December 6, 2006, using coded language,

2 defendant TERCERO directed defendant SALDANA to collect money,

3 including rent, from Miranda and Edgar Hernandez.

4    (43) On December 6, 2006, using coded language,

5 defendants TERCERO and EL BUKI discussed how Miranda previously

6 delivered crack cocaine to EL BUKI and that EL BUKI was going to

7 deliver rent to TERCERO via Miranda.

8    (44) On December 7, 2006, Miranda possessed

9 approximately 34.47 grams of crack cocaine, a sawed-off shotgun,

10 and a drug ledger at his home.

11    (45) On December 7, 2006, using coded language,

12 defendant PANTOJA told defendant TERCERO that there was a

13 problem, that he would call her on a different phone, and that

14 she should not use the phone.

15    (46) On December 7, 2006, using coded language,

16 defendants TERCERO and SALDANA discussed Miranda's arrest and

17 that TERCERO did not want to talk on the phone.

18    (47) On December 7, 2006, using coded language,

19 defendant TERCERO told defendant BERTOTTY about Miranda's

20 arrest, and BERTOTTY told TERCERO that she would call her back

21 on a different phone.

22    (48) On December 8, 2006, using coded language,

23 defendants TERCERO and VILLEDA discussed Miranda's arrest and

24 arranged to meet.

25    (49) On December 9, 2006, using coded language,

26 defendants TERCERO and VILLEDA arranged to have VILLEDA deliver

27 "five and five" (referring to quantities of two styles of crack

28 cocaine).

1          (50) On December 9, 2006, using coded language,
2    defendants TERCERO and SALDANA arranged to meet, and TERCERO
3    warned SALDANA to be careful because the police had been in CLCS
4    Organization territory.

5          (51) On December 9, 2006, using coded language,
6    defendant PANTOJA directed defendant EL BUKI to pay $200 in
7    rent.

8          (52) On December 9, 2006, defendants TERCERO and
9    VILLEDA met.

10         (53) On December 9, 2006, using coded language,
11   defendant TERCERO complained to defendant BERTOTTY that the
12   pieces of crack cocaine she had just obtained from defendant
13   VILLEDA were too small, and BERTOTTY responded that they had
14   been making the pieces of crack cocaine small and thick and that
15   they had been selling on the street.

16         (54) On December 9, 2006, using coded language,
17   defendant VILLEDA told defendant TERCERO not to worry about the
18   crack cocaine he had sold her because they had been selling on
19   the street, although some pieces were "tiny," and that VILLEDA
20   had been working on making the pieces "long and short."

21         (55) On December 10, 2006, using coded language,
22   defendant TERCERO directed defendant RIVERA to pick up "two
23   fives" (referring to quantities of two styles of crack cocaine)
24   from defendant VILLEDA the next day.

25         (56) On December 10, 2006, using coded language,
26   defendant TERCERO asked defendant BERTOTTY to have defendant
27   VILLEDA deliver the "fat kind" (referring to a style of crack
28   cocaine), and BERTOTTY responded that she would have it ready as

soon as possible and "use whatever" she had in her "kitchen" to make the crack cocaine.

(57) On December 11, 2006, using coded language, defendant TERCERO asked defendant VILLEDA to "bring her five and five for tonight" (referring to quantities of two styles of crack cocaine).

(58) On December 11, 2006, using coded language, defendant BERTOTTY told defendant TERCERO that BERTOTTY and defendant VILLEDA were in the midst of preparing crack cocaine that TERCERO had ordered.

(59) On December 11, 2006, using coded language, defendant TERCERO asked defendant BERTOTTY if she could bring the crack cocaine, and BERTOTTY responded that she and defendant VILLEDA were in the midst of preparing the crack cocaine.

(60) On December 11, 2006, defendants TERCERO, VILLEDA and BERTOTTY met.

(61) On December 12, 2006, using coded language, defendants TERCERO and VILLEDA discussed that VILLEDA would deliver "seven and eight" (referring to quantities of two styles of crack cocaine) and when TERCERO would make payment for it.

(62) On December 12, 2006, using coded language, defendant PANTOJA directed Gavarette to memorize PANTOJA's cell phone number and not to put it into Gavarette's own cell phone.

(63) On December 14, 2006, defendants VILLEDA and TERCERO met with Gavarette.

(64) On December 14, 2006, using coded language, defendant TERCERO told defendant PANTOJA that defendant VILLEDA and Gavarette had met.

67

1    (65) On December 14, 2006, using coded language,

2 defendant VILLEDA told defendant TERCERO the quantity and styles

3 of crack cocaine - "six small taquitos and five big hamburgers"

4 - VILLEDA had delivered to Gavarette.

5    (66) On December 15, 2006, using coded language,

6 defendant TERCERO asked defendant VILLEDA to drop off crack

7 cocaine to Gavarette, and VILLEDA responded that he needed an

8 hour to prepare the "small tacos" (referring to a style of crack

9 cocaine), but that he could quickly deliver as many of the "big

10 kind" (referring to a different style of crack cocaine) that

11 TERCERO wanted because the narcotics street dealers needed it

12 "right now."

13    (67) On December 15, 2006, using coded language,

14 defendants PANTOJA and SALDANA discussed collecting rent from

15 defendant CAPETILLO and that $740 had been collected from

16 daytime street dealers.

17    (68) On December 16, 2006, using coded language,

18 defendant SALDANA told defendant TERCERO that Gavarette needed

19 more of "both" kinds of crack cocaine because he had "five of

20 the chunkies left and he is out of the flats," and then

21 discussed with TERCERO how much more crack cocaine she should

22 order from defendant VILLEDA.

23    (69) On December 16, 2006, using coded language,

24 defendant BERTOTTY agreed to deliver "eight and five chunkies"

25 (referring to quantities and styles of crack cocaine) to

26 defendant TERCERO.

27    (70) On December 16, 2006, using coded language,

28 defendant TERCERO told Gavarette that defendant BERTOTTY was

1  going to deliver crack cocaine to him.

2          (71) On December 16, 2006, using coded language,

3  defendants TERCERO and VILLEDA discussed payment for crack

4  cocaine and that defendant BERTOTTY was going to deliver crack

5  cocaine to Gavarette.

6          (72) On December 18, 2006, using coded language,

7  defendant TERCERO told defendant VILLEDA that street dealers

8  were upset with the amount of rent they had to pay defendant

9  PANTOJA and had stopped selling crack cocaine in CLCS

10  Organization territory.

11         (73) On December 19, 2006, using coded language,

12  defendant R. RODRIGUEZ told defendant TERCERO that she had

13  collected $400 in rent from defendant J. VELASQUEZ but that he

14  still owed more money.

15         (74) On December 20, 2006, using coded language,

16  defendant SALDANA told defendant PANTOJA that defendant M.

17  GONZALES and another street dealer had purchased crack cocaine

18  from Gavarette that day.

19         (75) On December 20, 2006, using coded language,

20  defendants TERCERO and VILLEDA arranged to meet twice each week

21  so that TERCERO could purchase crack cocaine from VILLEDA on a

22  regular basis.

23         (76) On December 21, 2006, using coded language,

24  defendant AREVALO helped arrange a meeting between defendants

25  TERCERO and VILLEDA so that VILLEDA could deliver crack cocaine

26  to TERCERO.

27         (77) On December 23, 2006, using coded language,

28  defendant VILLEDA asked defendant TERCERO if, later that day, he

1   should deliver "the same as always" to TERCERO, to which TERCERO

2   replied "yes, seven" (referring to a quantity of crack cocaine).

3          (78) On December 27, 2006, using coded language,

4   defendant SALDANA told defendant TERCERO that defendant RIVAS

5   had paid two days worth of rent, that SALDANA was owed $800 from

6   Gavarette, and that SALDANA would try to collect rent from Edgar

7   Hernandez.

8          (79) On December 27, 2006, using coded language,

9   defendant TERCERO and Gavarette discussed money for crack

10  cocaine he had collected from street dealers, including

11  defendants DIAZ and RIVAS.

12         (80)  On December 29, 2006, using coded language,

13  defendants SALDANA and TERCERO, and Gavarette, discussed

14  quantities and styles -- including "chunky," "skinny," and

15  "flat" -- of crack cocaine provided to, and money owed by,

16  street dealers, including RIVAS.

17         (81) On December 29, 2006, using coded language,

18  defendant TERCERO told Gavarette that defendant VILLEDA would

19  deliver crack cocaine to him.

20         (82) On December 29, 2006, using coded language,

21  defendant TERCERO told Gavarette that if the narcotics street

22  dealers asked for some crack cocaine they must pay for it then

23  and not be given "credit" if they did not have money available

24  to pay for it.

25         (83) On December 29, 2006, using coded language,

26  defendant VILLEDA told defendant TERCERO that he had delivered

27  "seven fat ones and five skinny ones" (referring to quantities

28  and styles of crack cocaine) to Gavarette.

(84) On December 29, 2006, using coded language, defendant VILLEDA told defendant TERCERO to bring him money so that he could pay his own narcotics supplier, and TERCERO replied that she was waiting for defendant SALDANA to deliver money to her.

(85) On December 29, 2006, using coded language, defendants TERCERO and SALDANA arranged to meet so that SALDANA could deliver money to be used to pay for crack cocaine supplied by defendant VILLEDA.

(86) On December 29, 2006, using coded language, defendant TERCERO told defendant VILLEDA that defendant PANTOJA would meet him with money.

(87) On January 2, 2007, using coded language, defendant TERCERO directed defendant RIVERA to deliver rent collections.

(88) On January 2, 2007, using coded language, defendant TERCERO asked defendant VILLEDA to deliver "eight of the chunky kind" (referring to a quantity and style of crack cocaine) to Gavarette, to which defendant VILLEDA responded that he would call Gavarette "when it's ready."

(89) On January 2, 2007, using coded language, defendants PANTOJA, TERCERO, and SALDANA discussed the amount of money that SALDANA gave to Gavarette to pay defendant VILLEDA for crack cocaine.

(90) On January 4, 2007, using coded language, defendant TERCERO and Gavarette discussed how the police had stopped and searched him, but that they did not find anything on him.

71

1          (91) On January 5, 2007, using coded language,

2 defendant TERCERO asked defendant VILLEDA to deliver the "thin

3 kind" of crack cocaine to Gavarette, and VILLEDA agreed to do so

4 later.

5          (92) On January 9, 2007, defendants PANTOJA, TERCERO,

6 VILLEDA, and BERTOTTY met.

7          (93) On January 11, 2007, using coded language,

8 defendants PANTOJA and SALDANA discussed the collection of rent

9 from defendant FONSECA.

10          (94) On February 27, 2007, defendants DIAZ, GONZALES,

11 and CAPETILLO possessed and distributed crack cocaine in CLCS

12 Organization territory.

13          (95) On June 6, 2007, defendants DIAZ, GONZALES, and

14 RIVAS possessed and distributed crack cocaine in CLCS

15 Organization territory.

16          (96) On June 8, 2007, defendants DIAZ and RIVAS

17 possessed and distributed crack cocaine in CLCS Organization

18 territory.

19

20

21

22

23

24

25

26

27

28

COUNT THREE

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(iii); 18 U.S.C. § 2(a)]

On or about April 13, 2006, in Los Angeles County, within the Central District of California, defendant INGRID VERONICA TERCERO, also known as ("aka") "Morena," aka "More," knowingly and intentionally distributed at least five grams, that is, approximately 38.4 grams, of a mixture or substance containing a detectable amount of cocaine base in the form of crack cocaine, a schedule II narcotic drug controlled substance.

At the above time and place, defendant SERGIO PANTOJA, aka "Tricky," aided, abetted, counseled, commanded, induced, and procured the commission of the offense alleged above.

73

COUNT FOUR

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(iii); 18 U.S.C. § 2(a)]

On or about April 18, 2006, in Los Angeles County, within the Central District of California, defendant INGRID VERONICA TERCERO, also known as ("aka") "Morena," aka "More," knowingly and intentionally distributed at least five grams, that is, approximately 24.5 grams, of a mixture or substance containing a detectable amount of cocaine base in the form of crack cocaine, a schedule II narcotic drug controlled substance.

At the above time and place, defendant SERGIO PANTOJA, aka "Tricky," aided, abetted, counseled, commanded, induced, and procured the commission of the offense alleged above.

1

## COUNT FIVE

2

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(iii); 18 U.S.C. § 2(a)]

3

On or about April 19, 2006, in Los Angeles County, within

4

the Central District of California, defendant INGRID VERONICA

5

TERCERO, also known as ("aka") "Morena," aka "More," knowingly

6

and intentionally distributed at least five grams, that is,

7

approximately 47.9 grams, of a mixture or substance containing a

8

detectable amount of cocaine base in the form of crack cocaine,

9

a schedule II narcotic drug controlled substance.

10

At the above time and place, defendant SERGIO PANTOJA, aka

11

"Tricky," aided, abetted, counseled, commanded, induced, and

12

procured the commission of the offense alleged above.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT SIX

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(iii); 18 U.S.C. § 2(a)]

On or about May 2, 2006, in Los Angeles County, within the Central District of California, defendant INGRID VERONICA TERCERO, also known as ("aka") "Morena," aka "More," knowingly and intentionally distributed at least 50 grams, that is, approximately 68.7 grams, of a mixture or substance containing a detectable amount of cocaine base in the form of crack cocaine, a schedule II narcotic drug controlled substance.

At the above time and place, defendant SERGIO PANTOJA, aka "Tricky," aided, abetted, counseled, commanded, induced, and procured the commission of the offense alleged above.

76

COUNT SEVEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(iii); 18 U.S.C. § 2(a)]

On or about July 26, 2006, in Los Angeles County, within the Central District of California, defendant MARCO ANTHONY FONSECA, also known as ("aka") "Junior," aka "Primo," aka "Catracho," knowingly and intentionally distributed at least five grams, that is, approximately 31.7 grams, of a mixture or substance containing a detectable amount of cocaine base in the form of crack cocaine, a schedule II narcotic drug controlled substance.

At the above time and place, defendants SERGIO PANTOJA, aka "Tricky," and INGRID VERONICA TERCERO, aka "Morena," aka "More," aided, abetted, counseled, commanded, induced, and procured the commission of the offense alleged above.

COUNT EIGHT

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(iii)]

On or about March 15, 2006, in Los Angeles County, within the Central District of California, defendant JOSE ALBERTO ALVARENGA VILLEDA, also known as ("aka") "Chepe," aka "El Gordo," aka "El Señor," knowingly and intentionally distributed at least 50 grams, that is, approximately 110.8 grams, of a mixture or substance containing a detectable amount of cocaine base in the form of crack cocaine, a schedule II narcotic drug controlled substance.

1

2

3

4

5

6

7

8

9

10

COUNT NINE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(iii)]

   On or about May 22, 2006, in Los Angeles County, within the Central District of California, defendant JOSE ALBERTO ALVARENGA VILLEDA, also known as ("aka") "Chepe," aka "El Gordo," aka "El Señor," knowingly and intentionally distributed at least 50 grams, that is, approximately 58.7 grams, of a mixture or substance containing a detectable amount of cocaine base in the form of crack cocaine, a schedule II narcotic drug controlled substance.

COUNT TEN

[18 U.S.C. § 1956(h)]

1.   Paragraphs 1 through 27 of the Introductory Allegations of this Indictment are realleged and incorporated by reference as though fully set forth herein.

A.   OBJECTS OF THE CONSPIRACY

1.   Beginning on a date unknown to the Grand Jury, but no later than in or about October 2003, and continuing until in or about September 2008, in Los Angeles County, within the Central District of California, and elsewhere, defendants PANTOJA, GUILLEN, TERCERO, SALDANA, AREVALO, and RIVERA, and others known and unknown to the Grand Jury, knowingly and intentionally conspired and agreed to conduct financial transactions affecting interstate and foreign commerce involving the proceeds of specified unlawful activities, that is, the sale and distribution of narcotic controlled substances, in violation of Title 21, United States Code, Section 841(a)(1); and conspiracy to distribute narcotics, in violation of Title 21, United States Code, Section 846, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed in whole or in part to: (1) conceal and disguise the nature, location, source, ownership, and control of said proceeds, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and (2) promote the carrying on of the unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i).

80

B.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE
     ACCOMPLISHED

The objects of the conspiracy were to be accomplished in substance as follows:

1.   The presiding CLCS Organization shot caller, which role was held by defendant PANTOJA from approximately 2005 to 2007, assisted by other members and associates of the CLCS Organization, including defendants TERCERO, SALDANA, AREVALO, and RIVERA, would direct narcotics distributors operating in CLCS Organization territory to regularly pay rent to the CLCS Organization in exchange for "authorization" to sell narcotic controlled substances, including crack cocaine, in CLCS Organization territory.

2.   The presiding CLCS Organization shot caller, which role was held by defendant PANTOJA from approximately 2005 to 2007, assisted by other members and associates of the CLCS Organization, including defendants TERCERO, SALDANA, AREVALO, and RIVERA, would regularly collect and assist with the collection of rent from narcotics distributors operating in CLCS Organization territory.

3.   The presiding CLCS Organization shot caller, which role was held by defendant PANTOJA from approximately 2005 to 2007, assisted by other members and associates of the CLCS Organization, including defendant TERCERO, would maintain an accounting of the rent amounts paid to the CLCS Organization by narcotics distributors during each rent collection period, and calculate the percentage of the illicitly obtained proceeds that the CLCS Organization was required to pay to Mexican Mafia

1    Member 1, an unindicted co-conspirator.

2         4.    Defendant GUILLEN would arrange a date, time, and/or

3    method by which the rent money due and owing to Mexican Mafia

4    Member 1 would be delivered, or caused to be delivered, to

5    GUILLEN or his designee.

6         5.    The presiding CLCS Organization shot caller, which

7    role was held by defendant PANTOJA from approximately 2005 to

8    2007, assisted by other members and associates of the CLCS

9    Organization, would then deliver the money owed to Mexican Mafia

10   Member 1 to either defendant GUILLEN or his designee.

11        6.    Defendant GUILLEN would purchase or direct others on

12   his behalf to purchase money orders with a portion of this

13   money.

14        7.    Defendant GUILLEN would then cause the money to be

15   deposited into the Bureau of Prisons commissary account of

16   Mexican Mafia Member 1.

17        8.    As directed by Mexican Mafia Member 1, defendant

18   GUILLEN would distribute the remaining money among Mexican Mafia

19   Member 1's designees, including Mexican Mafia Member 1's family,

20   other incarcerated Mexican Mafia members and their designees,

21   and in businesses that GUILLEN operated on behalf of Mexican

22   Mafia Member 1.

23   C.   OVERT ACTS

24        In furtherance of the conspiracy and to accomplish the

25   objects of the conspiracy, defendants PANTOJA, GUILLEN, TERCERO,

26   SALDANA, AREVALO, and RIVERA, and others known and unknown to

27   the Grand Jury, committed various overt acts, within the Central

28   District of California, and elsewhere, including overt acts 5,

                                   82

8-10, 12-15, 19, 25-31, 34-36, 39-40, 42-44, 46-47, 49-52, 54-58, 60-63, 65-73, 75, 77-92, 94-125, 129-35, 146-49, 153-56, 181, and 183-236 as set forth in Count 1; overt acts 1-96, as set forth in Count 2; and Counts 11 through 20, hereby incorporated by reference, on the dates specified therein.

COUNTS ELEVEN THROUGH FIFTEEN

[18 U.S.C. §§ 1956(a)(1)(B)(i), 2(a)]

On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendant ISAAC GUILLEN, also known as ("aka") "Coach," knowing that the property involved in each of the financial transactions described below represented the proceeds of some form of unlawful activity, knowingly conducted and aided, abetted, counseled, commanded, and procured, and willfully caused others to conduct, the following financial transactions affecting interstate commerce, which transactions in fact involved the proceeds of specified unlawful activity, namely, conspiracy to distribute cocaine base in the form of crack cocaine, in violation of Title 21, United States Code, Section 846, knowing that each of the transactions was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of such specified unlawful activity:

| COUNT | DATE | TRANSACTION |
|---|---|---|
| ELEVEN | 8/14/06 | Deposit of $500 in United States currency into the Bureau of Prisons Commissary account for Mexican Mafia Member 1, an unindicted co-conspirator. |
| TWELVE | 9/18/06 | Deposit of $500 in United States currency into the Bureau of Prisons Commissary account for Mexican Mafia Member 1, an unindicted co-conspirator. |
| THIRTEEN | 10/18/06 | Deposit of $500 in United States currency into the Bureau of Prisons Commissary account for Mexican Mafia Member 1, an unindicted co-conspirator. |
| FOURTEEN | 11/21/06 | Deposit of $500 in United States currency into the Bureau of Prisons Commissary account for Mexican Mafia Member 1, an unindicted co-conspirator. |

84

| COUNT | DATE | TRANSACTION |
|-------|------|-------------|
| FIFTEEN | 12/17/06 | Deposit of $500 in United States currency into the Bureau of Prisons Commissary account for Mexican Mafia Member 1, an unindicted co-conspirator. |

85

COUNTS SIXTEEN THROUGH TWENTY

[18 U.S.C. §§ 1956(a)(1)(A)(i), 2(a)]

On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendant ISAAC GUILLEN, also known as ("aka") "Coach," knowing that the property involved in each of the financial transactions described below represented the proceeds of some form of unlawful activity, knowingly conducted and aided, abetted, counseled, commanded, and procured, the conducting of the following transactions, willfully caused others to conduct, the following financial transactions affecting interstate commerce, which transactions in fact involved the proceeds of specified unlawful activity, namely, conspiracy to distribute cocaine base in the form of crack cocaine, in violation of Title 21, United States Code, Section 846, with the intent to promote the carrying on of such specified unlawful activity:

| COUNT | DATE | TRANSACTION |
|---|---|---|
| SIXTEEN | 8/14/06 | Deposit of $500 in United States currency into the Bureau of Prisons Commissary account for Mexican Mafia Member 1, an unindicted co-conspirator. |
| SEVENTEEN | 9/18/06 | Deposit of $500 in United States currency into the Bureau of Prisons Commissary account for Mexican Mafia Member 1, an unindicted co-conspirator. |
| EIGHTEEN | 10/18/06 | Deposit of $500 in United States currency into the Bureau of Prisons Commissary account for Mexican Mafia Member 1. |
| NINETEEN | 11/21/06 | Deposit of $500 in United States currency into the Bureau of Prisons Commissary account for Mexican Mafia Member 1, an unindicted co-conspirator. |

86

| COUNT | DATE | TRANSACTION |
|-------|------|-------------|
| TWENTY | 12/17/06 | Deposit of $500 in United States currency into the Bureau of Prisons Commissary account for Mexican Mafia Member 1, an unindicted co-conspirator. |

COUNT TWENTY-ONE

[18 U.S.C. §§ 1959(a)(1), 2(a)]

1.    At all times relevant to this Indictment, the CLCS
Organization, as described more particularly in paragraphs 1
through 27 of the Introductory Allegations of this Indictment,
which paragraphs are incorporated and realleged herein as if set
forth in full, has constituted an enterprise as that term is
defined in Title 18, United States Code, Section 1959(b)(2),
that is, a group of individuals associated in fact, which was
engaged in, and the activities of which affected, interstate and
foreign commerce.

2.    At all times relevant to this Indictment, the above-
described enterprise, through its members and associates,
engaged in racketeering activity as defined in Title 18, United
States Code, Sections 1959(b)(1) and 1961(1), namely, acts
involving murder, extortion, and robbery, in violation of the
laws of the state of California; narcotics trafficking, in
violation of Title 21, United States Code, Sections 841 and 846;
witness tampering, in violation of Title 18, United States Code,
Section 1512; and money laundering, in violation of Title 18,
United States Code, Section 1956.

3.    On or about July 21, 2001, in Los Angeles County,
within the Central District of California, defendants EDUARDO
HERNANDEZ, L. IRAHETA, and V. IRAHETA, for the purpose of
maintaining and increasing position in the above-described
enterprise, an enterprise engaged in racketeering activity,

//

//

88

1   unlawfully and knowingly murdered, and aided, abetted,

2   counseled, commanded, induced, and procured the murder of, J.B.,

3   in violation of California Penal Code Sections 31, 187, and 189.

COUNT TWENTY-TWO

[18 U.S.C. § 1959(a)(5)]

1.   Paragraphs 1 through 27 of the Introductory Allegations and paragraphs 1 and 2 of Count 21 of this Indictment are hereby incorporated and realleged herein as if set forth in full.

2.   Beginning no later than September 15, 2007, and continuing through on or about September 21, 2007, in Los Angeles County, within the Central District of California, and elsewhere, defendants PANTOJA, MURILLO, Y. VELASQUEZ, D. GONZALEZ, MEJIA, J. GONZALEZ, ALAS, RANGEL, and JAMES WOOTEN, and others known and unknown to the Grand Jury, for the purpose of maintaining and increasing position in the CLCS Organization, an enterprise engaged in racketeering activity, unlawfully and knowingly conspired to commit an assault resulting in serious bodily injury to F.C., in violation of California Penal Code Sections 31 and 245.

90

COUNT TWENTY-THREE

[18 U.S.C. §§ 1959(a)(2), 2(a)]

1.    Paragraphs 1 through 27 of the Introductory Allegations and paragraphs 1 and 2 of Count 21 of this Indictment are hereby incorporated and realleged herein as if set forth in full.

2.    On September 15, 2007, in Los Angeles County, within the Central District of California, defendants PANTOJA, MURILLO, Y. VELASQUEZ, MEJIA, RANGEL, and D. GONZALEZ, and others known and unknown to the grand jury, for the purpose maintaining and increasing position in the CLCS Organization, an enterprise engaged in racketeering activity, unlawfully and knowingly maimed, and aided, abetted, counseled, commanded, induced, and procured the maiming of F.C., in violation of California Penal Code Sections 31, 203, and 204.

COUNT TWENTY-FOUR

[18 U.S.C. §§ 1959(a)(2), 2(a)]

1.    Paragraphs 1 through 27 of the Introductory
Allegations and paragraphs 1 and 2 of Count 21 of this
Indictment are hereby incorporated and realleged herein as if
set forth in full.

2.    On September 15, 2007, in Los Angeles County, within
the Central District of California, defendants PANTOJA, MURILLO,
D. GONZALEZ, Y. VELASQUEZ, MEJIA, and RANGEL, and others known
and unknown to the grand jury, for the purpose maintaining and
increasing position in the CLCS Organization, an enterprise
engaged in racketeering activity, unlawfully and knowingly
assaulted, and aided, abetted, counseled, commanded, induced,
and procured the assault resulting in serious bodily injury to
F.C., in violation of California Penal Code Sections 31 and 245.

92

COUNT TWENTY-FIVE

[18 U.S.C. §§ 1959(a)(1), 2(a)]

1.    Paragraphs 1 through 27 of the Introductory
Allegations and paragraphs 1 and 2 of Count 21 of this
Indictment are hereby incorporated and realleged herein as if
set forth in full.

2.    On or about September 15, 2007, in Los Angeles County,
within the Central District of California, defendants PANTOJA,
MURILLO, Y. VELASQUEZ, MEJIA, ALAS, RANGEL, D. GONZALEZ, J.
GONZALEZ, and JAMES WOOTEN, and others known and unknown to the
Grand Jury, for the purpose of maintaining and increasing
position in the CLCS Organization, an enterprise engaged in
racketeering activity, unlawfully and knowingly aided, abetted,
counseled, commanded, induced, and procured the unlawful felony-
murder of L.A.G., in violation of California Penal Code Sections
31, 187, 189, and 245.

93

COUNT TWENTY-SIX

[18 U.S.C. § 1959(a)(5)]

1.   Paragraphs 1 through 27 of the Introductory Allegations and paragraphs 1 and 2 of Count 21 of this Indictment are hereby incorporated and realleged herein as if set forth in full.

2.   Beginning no later than September 15, 2007, and continuing through on or about September 21, 2007, in Los Angeles County, within the Central District of California, and elsewhere, defendants PANTOJA, MURILLO, and PEREZ, and others known and unknown to the Grand Jury, for the purpose of maintaining and increasing position in the CLCS Organization, an enterprise engaged in racketeering activity, unlawfully and knowingly conspired to murder G.M., in violation of California Penal Code Sections 31, 182, 187, and 189.

94

COUNT TWENTY-SEVEN

[18 U.S.C. § 1959(a)(5)]

1.   Paragraphs 1 through 27 of the Introductory Allegations and paragraphs 1 and 2 of Count 21 of this Indictment are hereby incorporated and realleged herein as if set forth in full.

2.   Beginning on or about September 15, 2007, and continuing through on or about September 21, 2007, in Los Angeles County, within the Central District of California, and elsewhere, defendants PANTOJA, MURILLO, and PEREZ, and others known and unknown to the Grand Jury, for the purpose of maintaining and increasing position in the CLCS Organization, an enterprise engaged in racketeering activity, unlawfully and knowingly conspired to kidnap G.M., in violation of Title 18, United States Code, Section 1201(a)(1).

COUNT TWENTY-EIGHT

[18 U.S.C. §§ 1959(a)(5), 2(a)]

1. Paragraphs 1 through 27 of the Introductory Allegations and paragraphs 1 and 2 of Count 21 of this Indictment are hereby incorporated and realleged herein as if set forth in full.

2. Beginning on or about September 19, 2007, and continuing through on or about September 21, 2007, in Los Angeles County, within the Central District of California, and elsewhere, defendants MURILLO and PEREZ, aided, abetted, counseled, commanded, induced, and procured by defendant PANTOJA, and others known and unknown to the Grand Jury, for the purpose of maintaining and increasing position in the CLCS Organization, an enterprise engaged in racketeering activity, unlawfully and knowingly attempted to murder G.M., in violation of California Penal Code Sections 21a, 31, 187, 189, and 664.

96

COUNT TWENTY-NINE

[18 U.S.C. §§ 1959(a)(1), 2(a)]

1.  Paragraphs 1 through 27 of the Introductory Allegations and paragraphs 1 and 2 of Count 21 of this Indictment are hereby incorporated and realleged herein as if set forth in full.

2.  Beginning on or about September 19, 2007, and continuing through on or about September 21, 2007, in Los Angeles County, within the Central District of California, and elsewhere, defendants MURILLO and PEREZ, aided, abetted, counseled, commanded, induced, and procured by defendant PANTOJA, and others known and unknown to the Grand Jury, for the purpose of maintaining and increasing position in the CLCS Organization, an enterprise engaged in racketeering activity, unlawfully and knowingly kidnaped G.M., in violation of Title 18, United States Code, Section 1201(a)(1).

97

COUNT THIRTY

[18 U.S.C. § 1201(c)]

A.    OBJECT OF THE CONSPIRACY

Beginning on or about September 15, 2007, and continuing
through on or about September 21, 2007, in Los Angeles County,
within the Central District of California, and elsewhere,
defendants SERGIO PANTOJA, also known as ("aka") "Tricky"
("PANTOJA"), JUAN PABLO MURILLO, aka "Face" ("MURILLO"), and
JAVIER PEREZ, aka "Ranger" ("PEREZ"), and others known and
unknown to the Grand Jury, knowingly and unlawfully conspired,
confederated, and agreed with each other to willfully and
unlawfully inveigle, decoy, seize, confine, kidnap, abduct, and
carry away G.M. and hold G.M. for reward or otherwise, namely,
to effect the killing of G.M. and to maintain and increase each
defendant's position within the CLCS Organization, and did
willfully transport G.M. in foreign commerce, and did willfully
travel in foreign commerce in committing and in furtherance of
the commission of the offense, from California to Mexico, in
violation of Title 18, United States Code, Section 1201(a)(1).

B.    MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE
      ACCOMPLISHED

The object of the conspiracy was to be accomplished, in
substance, as follows:

1.    Defendants PANTOJA and MURILLO would use false
pretenses to convince G.M. to travel to Mexico.

2.    Defendant MURILLO would procure a car in which to
transport G.M. from Los Angeles, California, to Tijuana, Mexico.

3.    Defendant MURILLO would enlist the assistance of a

98

1 | another co-conspirator, defendant PEREZ, to assist with

2 | transporting and killing G.M.

3 |     4.   Defendants MURILLO and PEREZ would transport G.M. from

4 | Los Angeles, California, to Tijuana, Mexico.

5 |     5.   When in Tijuana, Mexico, defendants MURILLO and PEREZ

6 | would ply G.M. with large quantities of alcohol in order to get

7 | G.M. intoxicated.

8 |     6.   Defendants MURILLO and PEREZ would drive G.M. to a

9 | remote area near Mexicali, Mexico.

10 |     7.   Defendants MURILLO and PEREZ would strangle G.M. until

11 | they believed G.M. was dead.

12 |     8.   Defendants MURILLO and PEREZ would remove G.M.'s body

13 | from the car and dump it on the side of the road.

14 |     9.   Defendants MURILLO and PEREZ would return to the

15 | United States.

16 | C.   <u>OVERT ACTS</u>

17 |     On or about each of the following dates, within the Central

18 | District of California, and elsewhere, in furtherance of the

19 | conspiracy and to accomplish the object of the conspiracy,

20 | defendants PANTOJA, MURILLO, and PEREZ, and others known and

21 | unknown to the Grand Jury, committed the following overt acts,

22 | among others:

23 |     1.   On September 18, 2007, defendant PANTOJA spoke with

24 | G.M. and instructed him that he needed to travel from Los

25 | Angeles, California, to Mexico in order to hide from the law

26 | enforcement investigation into the murder of L.A.G.

27 |     2.   On September 18, 2007, defendant MURILLO advised G.M.

28 | that he would transport G.M. from Los Angeles, California, to

1  Mexico so that G.M. could hide from the law enforcement
2  investigation into the murder of L.A.G.

3      3.  On September 19, 2007, defendant MURILLO recruited
4  defendant PEREZ to assist in transporting G.M. to Mexico, and in
5  killing G.M. while in Mexico.

6      4.  On September 19, 2007, defendant MURILLO recruited an
7  18th Street Gang Member (Gang Member-1) to drive defendants
8  MURILLO and PEREZ, along with G.M., from Los Angeles,
9  California, to Mexico.

10      5.  On September 19, 2007, defendants MURILLO and PEREZ,
11  with the assistance of Gang Member-1, transported G.M. from Los
12  Angeles, California, to Tijuana, Mexico.

13      6.  On September 20, 2007, defendants MURILLO and PEREZ
14  plied G.M. with a significant quantity of alcohol in order to
15  get G.M. intoxicated.

16      7.  In the early morning of September 21, 2007, defendants
17  MURILLO and PEREZ, with the assistance of Gang Member-1,
18  transported an intoxicated G.M. to a remote roadside location
19  near Mexicali, Mexico.

20      8.  On September 21, 2007, defendant MURILLO instructed
21  Gang Member-1 to park the car on the side of the road at the
22  remote roadside location.

23      9.  On September 21, 2007, defendants MURILLO and PEREZ
24  strangled G.M. in the car by jointly pulling a rope around his
25  neck until MURILLO and PEREZ believed G.M. was dead.

26      10.  On September 21, 2007, defendants MURILLO and PEREZ
27  removed the apparently lifeless body of G.M. from Gang Member-
28  1's vehicle.

1        11.   On September 21, 2007, defendants MURILLO and PEREZ

2   dumped the apparently lifeless body of G.M. on the side of the

3   road.

4        12.   On September 21, 2007, defendants MURILLO and PEREZ,

5   along with Gang Member-1, drove back to the United States.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT THIRTY-ONE

[18 U.S.C. § 1201(a)(1)]

Beginning on or about September 19, 2007, and continuing through on or about September 21, 2007, in Los Angeles County, within the Central District of California, and elsewhere, defendants SERGIO PANTOJA, also known as ("aka") "Tricky" ("PANTOJA"), JUAN PABLO MURILLO, aka "Face" ("MURILLO"), and JAVIER PEREZ, aka "Ranger" ("PEREZ"), and others known and unknown to the Grand Jury, did willfully and unlawfully inveigle, decoy, seized, confine, kidnap, abduct, and carry away G.M., and held G.M. for reward or otherwise, namely to effect the killing of G.M. and to maintain and increase each defendant's position within the CLCS Organization, and did willfully transport G.M. in foreign commerce, and did willfully travel in foreign commerce in committing and in furtherance of the commission of the offense, from California to Mexico.

NOTICE OF SPECIAL FINDINGS

The allegations of Counts 21 and 25 of this Second Superseding Indictment are hereby realleged and incorporated by reference as if fully set forth herein.

DEFENDANT EDUARDO HERNANDEZ

As to Count 21, defendant EDUARDO HERNANDEZ:

1.   Was more than 18 years of age at the time of the offense (18 U.S.C. § 3591(a));

2.   Intentionally killed the victim (18 U.S.C. § 3591(a)(2)(A));

3.   Intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant in the offense, and the victim died as a result of the act (18 U.S.C. § 3591(a)(2)(C));

4.   Intentionally and specifically engaged in an act of violence knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a result of the act (18 U.S.C. § 3591(a)(2)(D));

5.   Knowingly created a grave risk of death to one or more persons in addition to the victim of the offense (18 U.S.C. § 3592(c)(5)); and

6.   Intentionally killed or attempted to kill more than one person in a single criminal episode (18 U.S.C. § 3592(c)(16)).

All pursuant to Title 18, United States Code, Sections 3591

1  and 3592.

2  DEFENDANT VLADIMIR IRAHETA

3  As to Count 21, defendant VLADIMIR IRAHETA:

4  1.   Was more than 18 years of age at the time of the

5  offense (18 U.S.C. § 3591(a));

6  2.   Intentionally killed the victim (18 U.S.C.

7  § 3591(a)(2)(A));

8  3.   Intentionally participated in an act, contemplating

9  that the life of a person would be taken or intending that

10  lethal force would be used in connection with a person, other

11  than a participant in the offense, and the victim died as a

12  result of the act (18 U.S.C. § 3591(a)(2)(C));

13  4.   Intentionally and specifically engaged in an act of

14  violence knowing that the act created a grave risk of death to a

15  person, other than one of the participants in the offense, such

16  that participation in the act constituted a reckless disregard

17  for human life and the victim died as a result of the act (18

18  U.S.C. § 3591(a)(2)(D));

19  5.   Knowingly created a grave risk of death to one or more

20  persons in addition to the victim of the offense (18 U.S.C.

21  § 3592(c)(5)); and

22  6.   Intentionally killed or attempted to kill more than

23  one person in a single criminal episode (18 U.S.C.

24  § 3592(c)(16)).

25  DEFENDANT LEONIDAS IRAHETA

26  As to Count 21, defendant LEONIDAS IRAHETA:

27  1.   Was more than 18 years of age at the time of the

28  offense (18 U.S.C. § 3591(a));

104

1    2.   Intentionally killed the victim (18 U.S.C.

2 § 3591(a)(2)(A));

3    3.   Intentionally participated in an act, contemplating

4 that the life of a person would be taken or intending that

5 lethal force would be used in connection with a person, other

6 than a participant in the offense, and the victim died as a

7 result of the act (18 U.S.C. § 3591(a)(2)(C));

8    4.   Intentionally and specifically engaged in an act of

9 violence knowing that the act created a grave risk of death to a

10 person, other than one of the participants in the offense, such

11 that participation in the act constituted a reckless disregard

12 for human life and the victim died as a result of the act (18

13 U.S.C. § 3591(a)(2)(D));

14    5.   Knowingly created a grave risk of death to one or more

15 persons in addition to the victim, the victim of the offense (18

16 U.S.C. § 3592(c)(5)); and

17    6.   Intentionally killed or attempted to kill more than

18 one person in a single criminal episode (18 U.S.C.

19 § 3592(c)(16)).

20    All pursuant to Title 18, United States Code, Sections 3591

21 and 3592.

22 DEFENDANT SERGIO PANTOJA

23    As to Count 25, defendant SERGIO PANTOJA:

24    1.   Was more than 18 years of age at the time of the

25 offense (18 U.S.C. § 3591(a));

26    2.   Intentionally participated in an act, contemplating

27 that the life of a person would be taken or intending that

28 lethal force would be used in connection with a person, other

1   than a participant in the offense, and the victim died as a

2   result of the act (18 U.S.C. § 3591(a)(2)(C));

3        3.   Intentionally and specifically engaged in an act of

4   violence knowing that the act created a grave risk of death to a

5   person, other than one of the participants in the offense, such

6   that participation in the act constituted a reckless disregard

7   for human life and the victim died as a result of the act (18

8   U.S.C. § 3591(a)(2)(D));

9        4.   Committed the offense after having previously been

10  convicted of a federal or state offense punishable by a term of

11  imprisonment of more than one year which involved the use or

12  attempted or threatened use of a firearm against a person (18

13  U.S.C. § 3592(c)(2));

14       5.   Knowingly created a grave risk of death to one or more

15  persons in addition to the victim of the offense (18 U.S.C.

16  § 3592(c)(5)); and

17       6.   Committed the offense against a victim who was

18  particularly vulnerable due to the victim's youth (18 U.S.C.

19  § 3592(c)(11)).

20       All pursuant to Title 18, United States Code, Sections 3591

21  and 3592.

22  DEFENDANT JUAN PABLO MURILLO

23       As to Count 25, defendant JUAN PABLO MURILLO:

24       1.   Was more than 18 years of age at the time of the

25  offense (18 U.S.C. § 3591(a));

26       2.   Intentionally participated in an act, contemplating

27  that the life of a person would be taken or intending that

28  lethal force would be used in connection with a person, other

106

1  than a participant in the offense, and the victim died as a

2  result of the act (18 U.S.C. § 3591(a)(2)(C));

3      3.   Intentionally and specifically engaged in an act of

4  violence knowing that the act created a grave risk of death to a

5  person, other than one of the participants in the offense, such

6  that participation in the act constituted a reckless disregard

7  for human life and the victim died as a result of the act (18

8  U.S.C. § 3591(a)(2)(D));

9      4.   Committed the offense after having previously been

10  convicted of a federal or state offenses punishable by a term of

11  imprisonment of more than one year which involved the use or

12  attempted or threatened use of a firearm against a person (18

13  U.S.C. § 3592(c)(2));

14      5.   Knowingly created a grave risk of death to one or more

15  persons in addition to the victim of the offense (18 U.S.C.

16  § 3592(c)(5)); and

17      6.   Committed the offense against a victim, who was

18  particularly vulnerable due to the victim's youth (18 U.S.C.

19  § 3592(c)(11)).

20      All pursuant to Title 18, United States Code, Sections 3591

21  and 3592.

22  DEFENDANT JANET GONZALEZ

23      As to Count 25, defendant JANET GONZALEZ:

24      1.   Was more than 18 years of age at the time of the

25  offense (18 U.S.C. § 3591(a));

26      2.   Intentionally participated in an act, contemplating

27  that the life of a person would be taken or intending that

28  lethal force would be used in connection with a person, other

than a participant in the offense, and the victim died as a result of the act (18 U.S.C. § 3591(a)(2)(C));

3.    Intentionally and specifically engaged in an act of violence knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a result of the act (18 U.S.C. § 3591(a)(2)(D));

4.    Knowingly created a grave risk of death to one or more persons in addition to the victim of the offense (18 U.S.C. § 3592(c)(5));

5.    Committed the offense after having been previously convicted of two or more state or federal offenses punishable by a term of imprisonment of more than one year, committed on different occasions, involving the distribution of a controlled substance (18 U.S.C. § 3592(c)(10)); and

6.    Committed the offense against a victim who was particularly vulnerable due to the victim's youth (18 U.S.C. § 3592(c)(11)).

All pursuant to Title 18, United States Code, Sections 3591 and 3592.

<u>DEFENDANT JUVENAL CARDENAS MEJIA</u>

As to Count 25, defendant JUVENAL CARDENAS MEJIA:

1.    Was more than 18 years of age at the time of the offense (18 U.S.C. § 3591(a));

2.    Intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other

than a participant in the offense, and the victim died as a
result of the act (18 U.S.C. § 3591(a)(2)(C));

    3.   Intentionally and specifically engaged in an act of
violence knowing that the act created a grave risk of death to a
person, other than one of the participants in the offense, such
that participation in the act constituted a reckless disregard
for human life and the victim died as a result of the act (18
U.S.C. § 3591(a)(2)(D));

    4.   Knowingly created a grave risk of death to one or more
persons in addition to the victim of the offense (18 U.S.C.
§ 3592(c)(5)); and

    5.   Committed the offense against a victim who was
particularly vulnerable due to the victim's youth (18 U.S.C.
§ 3592(c)(11)).

    All pursuant to Title 18, United States Code, Sections 3591
and 3592.

DEFENDANT DAVID GONZALEZ

    As to Count 25, defendant DAVID GONZALEZ:

    1.   Was more than 18 years of age at the time of the
offense (18 U.S.C. § 3591(a));

    2.   Intentionally participated in an act, contemplating
that the life of a person would be taken or intending that
lethal force would be used in connection with a person, other
than a participant in the offense, and the victim died as a
result of the act (18 U.S.C. § 3591(a)(2)(C));

    3.   Intentionally and specifically engaged in an act of
violence knowing that the act created a grave risk of death to a
person, other than one of the participants in the offense, such

109

1 | that participation in the act constituted a reckless disregard

2 | for human life and the victim died as a result of the act (18

3 | U.S.C. § 3591(a)(2)(D));

4 |     4. Knowingly created a grave risk of death to one or more

5 | persons in addition to the victim of the offense (18 U.S.C.

6 | § 3592(c)(5)); and

7 |     5. Committed the offense against a victim who was

8 | particularly vulnerable due to the victim's youth (18 U.S.C.

9 | § 3592(c)(11)).

10 |     All pursuant to Title 18, United States Code, Sections 3591

11 | and 3592.

12 | <u>DEFENDANT JAMES WOOTEN</u>

13 |     As to Count 25, defendant JAMES WOOTEN:

14 |     1. Was more than 18 years of age at the time of the

15 | offenses (18 U.S.C. § 3591(a));

16 |     2. Intentionally participated in an act, contemplating

17 | that the life of a person would be taken or intending that

18 | lethal force would be used in connection with a person, other

19 | than a participant in the offense, and the victim died as a

20 | result of the act (18 U.S.C. § 3591(a)(2)(C));

21 |     3. Intentionally and specifically engaged in an act of

22 | violence knowing that the act created a grave risk of death to a

23 | person, other than one of the participants in the offense, such

24 | that participation in the act constituted a reckless disregard

25 | for human life and the victim died as a result of the act (18

26 | U.S.C. § 3591(a)(2)(D));

27 |     4. Knowingly created a grave risk of death to one or more

28 | persons in addition to the victim of the offense (18 U.S.C.

110

§ 3592(c)(5)); and

    5.   Committed the offense against a victim who was particularly vulnerable due to the victim's youth (18 U.S.C. § 3592(c)(11)).

    All pursuant to Title 18, United States Code, Sections 3591 and 3592.

DEFENDANT GUADALUPE RANGEL

    As to Count 25, defendant GUADALUPE RANGEL:

    1.   Was more than 18 years of age at the time of the offenses (18 U.S.C. § 3591(a));

    2.   Intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant in the offense, and the victim died as a result of the act (18 U.S.C. § 3591(a)(2)(C));

    3.   Intentionally and specifically engaged in an act of violence knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a result of the act (18 U.S.C. § 3591(a)(2)(D));

    4.   Knowingly created a grave risk of death to one or more persons in addition to the victim of the offense (18 U.S.C. § 3592(c)(5)); and

    5.   Committed the offense against a victim who was particularly vulnerable due to the victim's youth (18 U.S.C. § 3592(c)(11)).

    All pursuant to Title 18, United States Code, Sections 3591

111

Case 2:07-cr-01172-DDP   Document 343   Filed 05/28/09   Page 112 of 114   Page ID #:1112

1   and 3592.

2   DEFENDANT YOVANNI VELASQUEZ

3       As to Count 25, defendant YOVANNI VELASQUEZ:

4       1.   Was more than 18 years of age at the time of the

5   offenses (18 U.S.C. § 3591(a));

6       2.   Intentionally participated in an act, contemplating

7   that the life of a person would be taken or intending that

8   lethal force would be used in connection with a person, other

9   than a participant in the offense, and the victim died as a

10  result of the act (18 U.S.C. § 3591(a)(2)(C));

11      3.   Intentionally and specifically engaged in an act of

12  violence knowing that the act created a grave risk of death to a

13  person, other than one of the participants in the offense, such

14  that participation in the act constituted a reckless disregard

15  for human life and the victim died as a result of the act (18

16  U.S.C. § 3591(a)(2)(D));

17      4.   Knowingly created a grave risk of death to one or more

18  persons in addition to the victim of the offense (18 U.S.C.

19  § 3592(c)(5)); and

20      5.   Committed the offense against a victim who was

21  particularly vulnerable due to youth (18 U.S.C.

22  § 3592(c)(11)).

23      All pursuant to Title 18, United States Code, Sections 3591

24  and 3592.

25  DEFENDANT JENNY ALAS

26      As to Count 25, defendant JENNY ALAS:

27      1.   Was more than 18 years of age at the time of the

28  offenses (18 U.S.C. § 3591(a));

                                112

2.    Intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant in the offense, and the victim died as a result of the act (18 U.S.C. § 3591(a)(2)(C));

3.    Intentionally and specifically engaged in an act of violence knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a result of the act   (18 U.S.C. § 3591(a)(2)(D));

4.    Knowingly created a grave risk of death to one or more persons in addition to the victim of the offense (18 U.S.C. § 3592(c)(5));

5.    Committed the offense after having been previously convicted of two or more state or federal offenses punishable by a term of imprisonment of more than one year, committed on different occasions, involving the distribution of a controlled substance (18 U.S.C. § 3592(c)(10)); and

//
//
//
//
//
//
//
//
//

113

6.  Committed the offense against a victim who was particularly vulnerable due to the victim's youth (18 U.S.C. § 3592(c)(11)).

All pursuant to Title 18, United States Code, Sections 3591 and 3592.

A TRUE BILL

/s/

Foreperson

THOMAS P. O'BRIEN
United States Attorney

CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Violent & Organized Crime Section

KEVIN M. LALLY
BRIAN R. MICHAEL
ABIGAIL W. EVANS
Assistant United States Attorneys
Violent & Organized Crime Section

114